Mary SCHULTZ, Appellant,

v.

The SECURITY NATIONAL BANK
and Kenneth Opstein, Appellee.

No. 96–2073.

Supreme Court of Iowa.

July 1, 1998.

Rehearing Denied Oct. 5, 1998.

Paul D. Lundberg of Shull, Cosgrove, Hellige & Lundberg, Sioux City, for appellee Kenneth Opstein.

Robert W. Green, Sioux City, for appellant.

Ryan K. Crayne of Heidman, Redmond, Fredregill, Patterson, Plaza & Dykstra, LLP, Sioux City, for appellee Security National Bank.

Considered by HARRIS, P.J., and LARSON, CARTER, NEUMAN, and TERNUS, JJ.

LARSON, Justice.

Mary Schultz sued the Security National Bank and Kenneth Opstein, her deceased husband's former employer. She alleged that the bank and Opstein conspired to convert a vehicle owned by her, and she demanded both compensatory and punitive damages. The court dismissed her entire suit against Opstein and her conspiracy claim against the bank. It also struck her claim for punitive damages. The jury awarded Schultz damages against the bank for the value of the car. Schultz appealed the court's rejection of her conspiracy theory and her claim for punitive damages. Opstein cross-appealed from the court's refusal to direct a verdict in favor of the bank. We affirm on both appeals.

## I. *Facts and Proceedings.*

Mary Schultz is the widow of Steve Schultz, who was a pitcher for Opstein's softball team in Sioux City. As part of Schultz's compensation, he was given a 1988 Isuzu Trooper II vehicle. The Security National Bank loaned the money for the Trooper on a security agreement signed by Opstein, who made all the payments on it. Title to the Trooper was placed in Mary's name, apparently because her husband had a bad driving record.

Steve Schultz was killed in an accident on October 10, 1990, while a passenger in a car driven by another pitcher for Opstein's team. In January 1991 Mary filed a wrongful death suit on behalf of Steve's estate against the owner of the car involved in the accident. Mary testified that within a few days of her filing that suit, Opstein called her and suggested that, if she persisted in the suit, Opstein would quit making payments on the Trooper and take the car. She also testified that Opstein told her that he would "make [her] life a living hell" if she did not drop the suit. Approximately two weeks later, Opstein sent Mary a letter implying that he was going to cease making payments and enclosed a past due notice from the bank. Eventually the bank sent Opstein and Schultz a notice of right to cure the default.

Mary filed a declaratory judgment and injunction action to determine what rights the bank had in the vehicle and to enjoin the bank from repossessing it. The court scheduled a hearing on the application for temporary injunction for July 12, 1991. However, on June 5, 1991, the bank repossessed the Trooper. The bank mailed Schultz and Opstein a notice of intent to sell the vehicle at a private sale. Opstein purchased the vehicle by paying off the amount of the unpaid loan.

On Schultz's suit for conversion and conspiracy, the district court granted Opstein's motion for directed verdict on all counts as to him. The court also granted the bank's motion for a directed verdict on the conspiracy and emotional distress theories and struck the plaintiff's claim for punitive damages.

The court submitted two special interrogatories to the jury, asking (1) whether Opstein had any ownership rights in the vehicle, and (2) what the value was of the vehicle at the time it was repossessed. The jury answered that Opstein had no ownership rights and set the value of the vehicle at $8475. The court granted judgment for Schultz on her conversion claim for that amount.

## II. *The Issues.*

The plaintiff's brief lists seven brief points, but her issues may accurately be reduced to two: (1) whether the court erred in directing

a verdict against her on the conspiracy claim, and (2) whether the court erred in refusing to submit punitive damages to the jury. A third issue is raised by Opstein in a cross-appeal on behalf of the bank: whether Opstein had "rights in the collateral" sufficient for him to give the bank a valid security agreement and thereby validate the bank's repossession of the Trooper. *See* Iowa Code § 554.9203(1)(c) (1993).

■ **A.** *The conspiracy issue.* The plaintiff complains that the court should have submitted the issue of an alleged conspiracy as well as conversion. However, she prevailed under her conversion theory and obtained a judgment for all of the compensatory damages to which the jury found her entitled. The issue of whether the court should have also submitted an additional theory is therefore moot; she could not recover any more under both theories than she did under the one.

■ **B.** *The punitive damages issue.* The court refused to submit the issue of punitive damages. The rule is that

> [p]unitive damages can be awarded if the jury finds "the conduct ... from which the claim arose constituted willful and wanton disregard for the rights or safety of another." Iowa Code § 668A.1(1)(a). The intentional acts of the defendant must be of "an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow...." *Fell v. Kewanee Farm Equip. Co.*, 457 N.W.2d 911, 919 (Iowa 1990)....
>
> ... The cases make it clear that punitive damages are awarded, not because a plaintiff deserves them, but as punishment, to deter the defendant and others from repeating *similar outrageous conduct.*

*Ezzone v. Riccardi*, 525 N.W.2d 388, 398 (Iowa 1994) (emphasis added). The conduct must be egregious. *Id.* Moreover,

> [a]n award of punitive damages is appropriate only when a party acts with actual or legal malice. Actual malice is shown by such things as personal spite, hatred, or ill will. Legal malice is established by showing wrongful conduct committed with a willful or reckless disregard for the rights of another.

*Parks v. City of Marshalltown*, 440 N.W.2d 377, 379 (Iowa 1989) (citations omitted).

■ The question is whether a rational jury could find by "a preponderance of clear, convincing, and satisfactory evidence," Iowa Code § 668A.1(a), that the bank's conduct constituted willful and wanton disregard for the rights of the plaintiff.

As we discuss in the next division, the evidence was in dispute on the issue of whether Opstein had an "ownership interest" in the vehicle. There was some evidence supporting Opstein's claim of such an interest: he had provided vehicles to four or five of his other ball players, and apparently the vehicles were considered to be Opstein's, although they had been titled in the names of the players. In addition, he used his own credit to buy the Trooper and made all the payments on it. There was also no evidence that he made an outright gift of the vehicle to Schultz.

In view of the facts available to the bank suggesting that it had a valid security interest in the vehicle, we do not believe a rational fact finder could find by clear, convincing, and satisfactory proof a willful and wanton disregard by the bank for the plaintiff's rights. The district court properly refused to submit punitive damages against the bank.

**C.** *The cross-appeal issue.* Opstein's cross-appeal raises the issue of whether the bank had a valid security interest in the vehicle and thus the right to repossess it. The jury found, as a fact, that Opstein had no ownership interest, but Opstein claims the question should have been answered the *other* way by the court, as a matter of law.

The threshold question is whether Opstein has standing to assert this claim on behalf of the bank, which did not appeal. Opstein claims that he has standing because he is obligated under a contract with the bank to indemnify the bank for any judgment against it. We need not resolve the question of standing, however, because we reject Opstein's argument on its merits.

■ Under Iowa Code section 554.9203(1)(c), in general, a security interest is enforceable against a debtor, such as Opstein, if "the debtor has rights in the collateral." Chapter 554 (the Uniform Commercial Code) does not define "rights in the collateral" and apparently neither have our cases. One commentator has said:

The basic reason for requiring rights in the collateral is not difficult to grasp. The Article 9 security interest is by nature a consensual interest. It arises because the debtor has consented to its existence. But the consent must be manifested with respect to assets which the debtor has some right to control. A stranger cannot create a security interest in assets which the stranger does not own or appropriately control. Giving such a power to a stranger would interfere with the rights of the person entitled to control the property. The debtor must have some authority over the assets in order to create an interest in them. The concept of rights in the collateral is rooted in authority over the collateral.

1 Peter F. Coogan et al., *Secured Transactions Under the Uniform Commercial Code* § 2B.02[2], at 2B–8 (U.C.C.Serv.(MB) 1998).

Opstein points to this undisputed evidence to show his "right to control" the vehicle: (1) he used his own credit to obtain it; (2) he had a history of providing vehicles for the use of his employees; (3) he had made no outright gift of it to Schultz; and (4) Opstein made all of the payments on it. He argues from these facts that the court should have decided as a matter of law that he had ownership rights in the vehicle sufficient to give a security interest in it to the bank.

The plaintiff counters that, as a matter of law, Opstein could not have an ownership or security interest in the vehicle because such interests are not authorized by Iowa Code section 321.45(2), which provides:

No person shall acquire any right, title, claim or interest in or to any vehicle subject to registration under this chapter from the owner thereof except by virtue of a certificate of title issued or assigned to the person for such vehicle or by virtue of a manufacturer's or importer's certificate delivered to the person for such vehicle. . . .

■ Between a buyer and seller, a certificate of title is not conclusive on the question of ownership, but is only prima facie evidence of it. *Sandhorst v. Mauk's Transfer, Inc.,* 252 N.W.2d 393, 398 (Iowa 1977). As to all other parties, unless an interest is noted on the certificate of title, it cannot be valid. *Blessing v. Norwest Bank Marion,* 429 N.W.2d 142, 144–45 (Iowa 1988).

The court refused to decide this issue either way as a matter of law. Rather, it submitted the issue to the jury to determine as a fact whether Opstein had any interests in the vehicle. Under the court's instruction, the certificate of title showing ownership in the plaintiff was only one of the factors for the jury to consider. Instruction No. 13 stated:

There are many factors you may consider in determining whether Kenneth Opstein had "rights" in the Isuzu Trooper. You may, but are not required to consider the following:

1) Whether Kenneth Opstein ever had possession of the vehicle prior to the repossession;

2) Whether Mary Schultz or Steve Schultz ever expressly or impliedly authorized Kenneth Opstein to use the vehicle as collateral;

3) Who paid for the vehicle;

4) Who had possession of the certificate of title;

5) The intentions of the parties.

Because the jury resolved this factual issue against Opstein, he could successfully claim an interest in the vehicle only if he had rights in it as a matter of law. We believe that he has failed to establish such rights. Accordingly, we affirm on the cross-appeal.

**AFFIRMED ON BOTH APPEALS.**