**ESTATE OF Jillene LONG, by and through its Administrator, Dolores SMITH, Appellant,**

v.

**BROADLAWNS MEDICAL CENTER and Margaret Shin, Individually and in her Official Capacity as Employee or Agent of Defendant Broadlawns Medical Center, Appellees.**

No. 00-1769.

Supreme Court of Iowa.

Dec. 18, 2002.

As Amended on Denial of Rehearing Feb. 10, 2003.

Alfredo Parrish, Maggi Moss and Robert P. Montgomery of Parrish Kruidenier Moss Dunn Montgomery Boles & Gribble, L.L.P., Des Moines, for appellant.

David L. Brown of Hansen, McClintock & Riley, Des Moines, for appellees.

CADY, Justice.

Sixteen people were murdered or killed in Iowa in 1996 as a result of domestic violence.[1] Jillene Long was one of the sixteen victims. This appeal concerns a negligence lawsuit filed by her estate against a hospital that treated the perpetrator of the crime for a psychiatric illness during the week preceding the murder.[2] Core among an assortment of legal issues presented on appeal and cross-appeal following the entry of a judgment for the estate is the proper theory of negligence to be applied in a case of this nature. Ultimately, we conclude the trial court properly instructed on the theory of negligence, but erred in permitting the jury to award damages for pre-death pain and suffering. We therefore set aside a portion of the damages awarded, but otherwise affirm the judgment of the district court.

## I. Background Facts and Proceedings.

During the evening of July 19, 1996, Gerald Long fired a gun at his wife, Jillene Long. This would become the penultimate incident in a long and tragic history of domestic violence perpetrated by Gerald on Jillene, and would be followed six days later by his final act of violence which resulted in her death.

After firing the gun that evening, Gerald left the marital residence and went to the Veterans Administration hospital in Des Moines seeking some form of assistance. Soon after arriving at the Veterans hospital, Gerald was transferred to Iowa Lutheran Hospital, also in Des Moines, where

1. The crime victim assistance division of the office of the Iowa Attorney General maintains records of the annual death toll from domestic violence in Iowa. Nearly three-fourths of the more than 1800 murders committed nationally in 1996 that were attributable to intimate partners involved female victims. Lawrence A. Greenfeld, et al., *Violence by Intimates: Analysis of Data on Crimes by Current or Former Spouses, Boyfriends, and Girlfriends* at v. (1998), *available at* http://www.ojp.usdoj.gov/bjs/pub/pdf/vi.pdf. "Since 1976 nearly 52,000 men and women have been murdered by those with whom they shared an intimate relationship." *Id.* at 6.

2. The perpetrator, Jillene's husband, was convicted of murder following a jury trial. *See State v. Long*, 628 N.W.2d 440, 442 (Iowa 2001). He acknowledged that he killed Jillene, but asserted the defense of diminished capacity based on a psychiatric illness. *Id.* The jury rejected the claim and found him guilty of first-degree murder. We subsequently reversed the conviction on appeal and ordered a new trial based on the erroneous admission of crucial hearsay statements at the trial. *Id.* at 447.

he sought voluntary psychiatric medical treatment. After his arrival at Iowa Lutheran, Gerald was observed exhibiting homicidal and suicidal tendencies, was suffering from hallucinations and flashbacks, and stated that he was "losing control."

Although initially accepted for treatment at Iowa Lutheran, provisions of Gerald's health insurance required a subsequent transfer to Broadlawns Medical Center in Des Moines on July 22. At Broadlawns, Gerald was seen by Margaret Shin, M.D., the attending physician. Dr. Shin further diagnosed Gerald as suffering from post-traumatic stress disorder versus dissociative disorder and dependencies on alcohol, marijuana, and methamphetamine. However, after his arrival at Broadlawns, Gerald's erratic behavior appeared to plateau. On July 23, the decision was made by Gerald's treating physicians to transfer him once again, this time to the University of Iowa Hospitals and Clinics in Iowa City for inpatient substance abuse treatment.

As Gerald was shuttled between the Des Moines hospitals, Jillene was kept abreast of his treatment through contacts with his primary treating physician at Iowa Lutheran and Charlyn Dowling–Smith, a social worker in the adult inpatient behavioral health unit at Broadlawns who had been assigned to his case. Jillene also had contact with the Des Moines Police Department, first on the night of the gun incident and then later when she sought advice on whether she should deliver some of Gerald's personal possessions to Broadlawns so that he would have them during his stay in Iowa City. The conversations between Jillene and medical and police staff included discussions of the history of Gerald's abuse of Jillene, the nature of the treatment being sought by Gerald, and the potential danger to Jillene should she remain in the marital residence. Jillene's conversation with Charlyn Dowling–Smith covered an array of issues. Most importantly, Charlyn told Jillene that Broadlawns would call her on the day of Gerald's discharge.

Gerald was discharged from Broadlawns early in the morning on July 25. He promptly boarded a bus and journeyed to Iowa City where he successfully arrived at the chemical dependency center and took part in a general history and assessment for purposes of his treatment. However, after taking part in the assessment, Gerald walked away from the facility. After leaving the center, Gerald went to a local pawnshop, pawned his watch, and bought a bus ticket back to Des Moines. Gerald returned to the marital residence, perhaps to lie in wait for Jillene. When Jillene returned to the home that evening, Gerald shot her several times, killing her.

This appeal arises out of a civil action pursued on behalf of the Estate of Jillene Long by its administrator, Dolores Smith. The Estate filed the underlying action on May 30, 1997, alleging that Broadlawns and Margaret Shin, M.D. (collectively Broadlawns), as well as other persons, facilities, or agents of those facilities, were negligent in failing to uphold a promise, allegedly conveyed to Jillene during Gerald's week of treatment, to notify her when he had been discharged from Broadlawns. The case was brought to trial on April 10, 2000. The jury returned a verdict on April 27 in favor of the Estate. Broadlawns filed a motion for judgment notwithstanding the verdict and a motion for new trial. The motion for judgment notwithstanding the verdict was granted in part and denied in part while the motion for new trial was denied in its entirety. The Estate subsequently appealed, as did Broadlawns, both on a number of

grounds.[3] We turn now to our consideration of the many arguments advanced by the parties.

## II. Broadlawns' Motion for Judgment Notwithstanding the Verdict.

Broadlawns was largely unsuccessful in its post-trial motions and reasserts on appeal many of the issues initially put before the district court. The lone success in Broadlawns' motions came in the district court's conclusion that the jury's award of punitive damages was improper in light of the evidence adduced at trial. The Estate appeals from that conclusion. In addition, the parties join in challenging, under different theories, the district court's approach to the negligence standard applied in this case. Both of these issues, and others, were raised by the defendant's motion for judgment notwithstanding the verdict and were therefore preserved for our review.

■ We review the district court's decisions on the motion for errors at law. Iowa R.App. P. 6.4. In undertaking our review, we "inquire whether substantial evidence exists to support each element of the plaintiff's claim, justifying submission of the case to the jury." *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 391 (Iowa 2001). This determination is made viewing "the evidence in the light most favorable to the nonmoving party." *Id.*

### 1. Duty to a Nonpatient Family Member.

■ The principal dispute between the parties focuses on the correct standard of liability to be applied in this case. Broadlawns renews a number of arguments presented to the district court, believing a decision in its favor on any of the issues undercuts the jury's ultimate finding of negligence on the part of the hospital and its agent in failing to timely notify Jillene of Gerald's discharge.[4] For its part, the Estate asserts as an appellate issue that the trial court erred in failing to submit the case under the principles of liability described in *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). It is important to note that the Estate obtained a favorable verdict on the negligence issue in the district court, which militates against review of its argument on appeal. *See Iowa Coal Mining Co. v. Monroe County*, 555 N.W.2d 418, 445 (Iowa 1996); *Johnston Equip. Corp. v. Indus. Indem.*, 489 N.W.2d 13, 16 (Iowa 1992); *Wassom v. Sac County Fair Ass'n*, 313 N.W.2d 548, 550 (Iowa 1981); *Wyatt v. Crimmins*, 277 N.W.2d 615, 617 (1979). Our conclusions on this issue, however, both incorporate and refute the position of the Estate, and we find no harm in considering their arguments together with those of Broadlawns.

Much of the controversy over this issue arises because the factual posture of this

---

3. The issues presented by the Estate on appeal are largely subsumed by the arguments of Broadlawns. For that reason, the Estate's arguments will be considered at appropriate places through the course of our opinion but will not be considered in separate subsections.

4. Broadlawns argues that the district court erred in (1) failing to apply its conclusions from a companion ruling in the case on the issue of promissory estoppel, (2) predicating

the alleged duty described to the jury on *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976), (3) failing to grant a directed verdict in favor of the defendants to maintain consistency with common law duty principles and Iowa Supreme Court precedent, (4) erroneously relying on the duty principles of Restatement (Second) of Torts § 323 (1965), and (5) failing to instruct that Jillene knew of Gerald's impending transfer to Oakdale.

case seemingly implicates both *Tarasoff* and the Restatement (Second) of Torts section 323 (1965). In *Tarasoff*, the California Supreme Court recognized that a special relationship between a psychotherapist and his or her patient "may support affirmative duties for the benefit of third persons." *Tarasoff*, 131 Cal.Rptr. 14, 551 P.2d at 343. In that case, a patient had threatened in the presence of his doctor to kill a third party. *Id.* at 339. The court determined that a concomitant duty to warn ran from the psychiatrist to the eventual victim. *Id.* at 348. Thus, where the psychotherapist determines,

> or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or take whatever other steps are reasonably necessary in the circumstances.

*In re Estate of Votteler*, 327 N.W.2d 759, 760 (Iowa 1982) (quoting *Tarasoff*, 131 Cal. Rptr. 14, 551 P.2d at 340). Clearly, this case has factual similarities to *Tarasoff*. However, the principles of section 323 are also relevant. Section 323 provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

> (a) his failure to exercise such care increases the risk of such harm, or

> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323.

In deciding Broadlawns' motion for judgment notwithstanding the verdict, the district court reiterated its belief that the case presented a question of liability under the duty principles described in section 323. Moreover, the district court reminded the parties that the case was submitted to the jury under those principles. We find no error in the district court's conclusion that this case was to be considered under the Restatement, and we believe the issue was properly submitted to the jury.

We have not previously adopted the duty principles enunciated in *Tarasoff* and do not do so at this time. *See Anthony v. State*, 374 N.W.2d 662, 668–69 (Iowa 1985); *In re Estate of Votteler*, 327 N.W.2d at 761–62; *Cole v. Taylor*, 301 N.W.2d 766, 767–68 (Iowa 1981). The underlying factual dispute in this case and the issue on which the entire case turns focuses on the nature of the promise allegedly made to Jillene during the week of Gerald's treatment.[5] Although a special relationship (in

---

**5.** Although somewhat evasive in her testimony, Charlyn Dowling–Smith, Gerald's social worker during his time at Broadlawns, testified:

> Q. Let's take it one step at a time. Okay? When you talked to [Jillene] she said, please let me know the specific discharge plan? That's what she told you, right? A. Yes.

> Q. And that was on a July 23rd call you had directly with her? A. Yes.

> Q. And in that same call you told her, in response, you gave her the assurance that Broadlawns would call her back later to let her know about the specific discharge plans, correct? A. I was to call her on the day that he was being discharged.

> Q. Right. And on July 23rd when you talked to her you assured her you would

*Tarasoff* parlance) may have existed between Broadlawns and Gerald, the real issue arises from whether Broadlawns failed to exercise reasonable care in performing a promise to warn Jillene of Gerald's discharge thereby increasing the risk of harm to her or resulting in harm to her because of her reliance on the promised warning. *See* Restatement (Second) of Torts § 323.

■■■ Clearly, Jillene was aware of the danger posed by Gerald. In all likelihood, this danger was the very reason she sought notification of his discharge from Broadlawns. The duty in this case, therefore, does not arise from the special relationship between Broadlawns and Gerald. Instead, it arises from a relationship created between Broadlawns and Jillene. As we have noted on a previous occasion:

> [Section] 323(a) applies only when the defendant's actions increased the risk of harm to plaintiff relative to the risk that would have existed had the defendant never provided the services initially. Put another way, the defendant's negligent performance must somehow put the plaintiff in a worse situation than if the defendant had never begun performance.... [T]o prevail under a theory of increased harm a plaintiff must "identify the sins of commission rather than sins of omission." ...
>
> Likewise with respect to the "reliance" prong of section 323(b), [there is a] general requirement that the plaintiff show "actual or affirmative reliance, i.e., reliance 'based on specific actions or representations which cause a person to fore-

go other alternatives of protecting themselves.'"

*Jain v. State,* 617 N.W.2d 293, 299 (Iowa 2000) (quoting *Power v. Boles,* 110 Ohio App.3d 29, 673 N.E.2d 617, 620 (1996) (citation omitted)). This case is squarely within the principles of section 323. The promise to warn is the service undertaken, which implicates the Restatement section.

Broadlawns asserts that the *Jain* case is actually indicative of the *in* applicability of section 323 to this case. In *Jain,* the family of a student who committed suicide in a residence hall at the University of Iowa sued the state alleging that the university and its agents had breached a duty of care to the student arising from a special relationship created by their knowledge of the student's fragile mental state. *Id.* In considering that case under section 323, we determined that "no action by university personnel prevented [the student] from taking advantage of the help and encouragement being offered, nor did they do anything to prevent him from seeking help on his own accord." *Id.* at 299. Moreover, "[t]he record [was] similarly devoid of any proof that [the student] relied, to his detriment, on the services gratuitously offered by these same personnel." *Id.*

We believe that *Jain* is clearly distinguishable from the present case. In the first place, there were limited facts in the *Jain* case to indicate that any service had been undertaken, gratuitously or for consideration, on Jain's behalf. In this case, however, there is significant evidence, including the testimony of the individual who allegedly promised to warn Jillene, that a

---

call her back to notify her of the specific discharge plan, did you not? A. I gave her the discharge plan on July 23rd. And I followed it up on the 25th with a followup [sic] call.

One of the major factual disputes between the parties focused on if, when, and how

Charlyn made a follow-up phone call to Jillene. There is evidence in the record from which the jury could conclude that a Broadlawn's employee left a telephone message at Jillene's residence on the day of the murder, some eight or more hours after Gerald was discharged from Broadlawns.

service was undertaken for her benefit. In addition, there is evidence from which the jury could have determined that any promise made by Broadlawns caused Jillene to alter her course of conduct during the week in which Gerald was hospitalized. Moreover, it is reasonable to infer she relied on that promise in undertaking her various activities after the promise was made. The determinations made in *Jain* were made under a factual scenario significantly different from the one present in this case. We believe it was proper to submit this case to the jury under the principles of section 323.

### 2. Effect of Victim's Knowledge of Harm.

 Broadlawns strongly urges that Jillene's awareness of the danger posed by Gerald should eliminate its duty to warn of his discharge. Indeed, there is significant evidence in the record indicating that Jillene was well aware of Gerald's violent propensities and had long been the primary target of his violence. Moreover, Jillene's knowledge of Gerald's violent nature was likely the reason she sought notice of his discharge. Launching from this evidence, Broadlawns argues that language from our decision in *In re Estate of Votteler* warrants a finding that Jillene's knowledge negates Broadlawns' duty. However, Broadlawns' reading of *Votteler* misapprehends its language.

In *Votteler,* we decided the *Tarasoff* rule should not "be stretched to support finding a cause of action against the psychotherapist" in the particular circumstances presented. *In re Estate of Votteler,* 327 N.W.2d at 761. We then observed,

> California has limited the duty to warn in *Tarasoff* to known and specifically foreseeable and identifiable victims . . . . This limitation has been adopted by other courts . . . . We have no

occasion to determine whether that limitation would apply here. It demonstrates, however, that the *Tarasoff* duty is not open-ended. It also supports a conclusion that *the duty* should not be imposed when the foreseeable victim knows of the danger.

*Id.* at 762 (citations omitted) (emphasis added).

As we noted previously, *Tarasoff* is inapplicable to this case. The *Votteler* language on which Broadlawns relies in arguing that Jillene's knowledge should have negated its duty arose specifically in the context of a discussion of *Tarasoff* principles. *Id.* Thus, that language does not apply to this case. Moreover, we do not believe that a victim's knowledge of an underlying risk of harm should be a specific exception to the type of duty arising under Restatement (Second) of Torts section 323. A jury may instead consider such knowledge as it balances the duty principles of section 323 or considers other related issues.

### 3. Causal Connection.

Broadlawns next argues that the Estate failed to meet its burden to show a causal relationship between its alleged failure to notify Jillene and her subsequent death at Gerald's hands. Moreover, it asserts that the district court erred in failing to find a lack of causal connection, most notably because the Estate failed to provide expert testimony on causation. They claim that expert testimony was needed to inform the jury on "the predictability and probability of the actions of a mental health patient" such as Gerald.

 In order for the Estate to succeed in its claim for damages, it had the burden of showing that Broadlawns' conduct was a proximate cause of the alleged damages to Jillene. "Proximate cause has two components: (1) the defendant's conduct must have in fact caused the dam-

ages; and (2) the policy of the law must require the defendant to be legally responsible for them." *City of Cedar Falls v. Cedar Falls Cmty. Sch. Dist.*, 617 N.W.2d 11, 17 (Iowa 2000). Under the first standard, "a plaintiff must at a minimum prove that the damages would not have occurred but for the defendant's negligence." *Id.* "[I]n order to satisfy the cause-in-fact component, the plaintiff must also show the defendant's conduct was a 'substantial factor' in bringing about the harm." *Id.* Under the second standard, the court considers the proximity between the breach and the injury based largely on the concept of foreseeability. *Id.*

 Expert testimony may be helpful in establishing causation, but "[w]e do not indiscriminately impose a requirement for expert testimony in order to establish an element for tort recovery." *Roling v. Daily*, 596 N.W.2d 72, 75 (Iowa 1999). Even if "expert testimony would clearly be helpful to fact finders . . . it is not a condition precedent." *Schlader v. Interstate Power Co.*, 591 N.W.2d 10, 14 (Iowa 1999). Furthermore, it is unnecessary to present expert testimony on causation in those situations in which the subject "is within the common experience of laypersons." *Welte v. Bello*, 482 N.W.2d 437, 441 (Iowa 1992).

### a. Expert Testimony.

 We, like the district court, struggle to see how expert testimony was required in this case. The core negligence issue presented focused on whether Broadlawns fulfilled a promise to Jillene to notify her upon Gerald's discharge. A consideration of the issues surrounding this alleged promise raised no real questions of a "scientific, technical, or other specialized" nature that would require testimony by an expert to "assist the trier of fact to understand the evidence or to determine a fact in issue." Iowa R. Evid.

5.702. In fact, the use of expert testimony on this issue in this case would likely have created "confusion of the issues" or one of the other evils our rules of evidence operate to prevent. Iowa R. Evid. 5.403. Expert testimony on causation and "the predictability and probability of the actions of a mental health patient" was unnecessary in this case.

### b. Factual Causation.

 Broadlawns asserts that the Estate failed to advance substantial evidence showing that its actions "in fact caused the damages" to Jillene. *City of Cedar Falls*, 617 N.W.2d at 17. It offers a series of facts that it believes interrupt the causal chain of events from Gerald's discharge to Jillene's death. No matter the number of events that occurred, however, the ultimate question in relation to this issue is whether Broadlawns' failure to notify Jillene of Gerald's discharge in fact led to her death.

As the district court acknowledged, this issue is complicated by the fact that Jillene was unable to testify to her course of conduct leading up to her death. However, examining the circumstantial evidence in the case, as the district court did and as the jury did implicitly, we agree substantial evidence exists to support a finding that Jillene would not have been at the marital residence had she known Gerald was discharged and essentially free to return there himself. Therefore, but for Broadlawns' failure to notify her as promised, Jillene would not have been in a position where she could be injured. We believe that factual causation was established in this case by substantial, albeit circumstantial, evidence.

### c. Legal Causation.

 As previously discussed, this case was properly handled as one based upon

the principles of Restatement (Second) of Torts section 323. This court has applied section 323 or cited it with approval on a number of occasions,[6] acknowledging that "the policy of the law [requires] the defendant to be legally responsible for [damages]" arising from the breach of duty described by the section. *Id.* For this reason, legal causation is also satisfied in this case. Thus, the evidence adduced by the Estate satisfied both factual and legal causation. The district court correctly decided the issue.

### 4. Superseding or Intervening Cause.

 Broadlawns raises another significant issue of causation by asserting that Gerald's homicidal act served to become a superseding or intervening cause of Jillene's injury and death. It is a familiar rule that "[w]hen conduct or forces occur after an actor's conduct, the actor may be relieved from liability if ... the later-occurring event breaks the chain of causal events between the actor's negligence and the plaintiff's injury." *Rieger v. Jacque,* 584 N.W.2d 247, 251 (Iowa 1998). Such a later-occurring event may be a superseding cause, *i.e.,* "a third-party's act (or other force) that intervenes to protect a defendant from liability for harm to the plaintiff," or an intervening force " 'which actively operates to produce harm to another after the actor's negligent act or omission has been committed.' " *Rieger,* 584 N.W.2d at 251 (quoting *Hollingsworth v. Schminkey,* 553 N.W.2d 591, 597 (Iowa 1996) (citation omitted)). However, we have also acknowledged that

> the defendant cannot be relieved from liability by the fact that the risk, or a substantial or important part of the risk, to which the defendant has subjected the plaintiff has indeed come to pass. Foreseeable intervening forces are within the scope of the original risk, and hence of the defendant's negligence. The courts are quite generally agreed that intervening causes which fall fairly in this category will not supersede the defendant's responsibility.

*Tenney v. Atl. Assoc.,* 594 N.W.2d 11, 21 (Iowa 1999) (quoting W. Page Prosser et al., *Prosser & Keeton on the Law of Torts* § 44, at 303–04 (5th ed.1984) (footnote omitted)). "Put another way, an intervening force which falls squarely within the scope of the original risk will not supersede the defendant's responsibility." *Rieger,* 584 N.W.2d at 251–52.

At first blush, Gerald's act would appear to be just the type of intervening or superseding occurrence that would interrupt the causal chain sufficiently to eliminate Broadlawns' liability. However, Gerald's act "falls squarely within the scope of the original risk" Jillene was attempting to avoid in seeking assurances that she would be warned of Gerald's discharge. *Id.* We cannot allow Broadlawns to hide behind Gerald's act when its inaction may have directly paved the way for him to act. The district court was correct in its determination that Gerald's actions did not amount to a superseding or intervening cause.

### 5. Sole Proximate Cause.

Broadlawns also argues that the district court committed reversible error in failing to submit to the jury an instruction on sole proximate cause. The concept of sole proximate cause "rests on the notion that

6. *See Wright v. Brooke Group Ltd.,* 652 N.W.2d 159, 177–78 (Iowa 2002); *Jain v. State,* 617 N.W.2d 293, 298–300 (Iowa 2000); *Am. State Bank v. Enabnit,* 471 N.W.2d 829, 832 (Iowa 1991); *DeBurkarte v. Louvar,* 393 N.W.2d 131, 135–37 (Iowa 1986); *Van Iperen v. Van Bramer,* 392 N.W.2d 480, 485 (Iowa 1986); *Wilson v. Nepstad,* 282 N.W.2d 664, 673 n. 1 (Iowa 1979).

some third party or other independent event was the sole cause of the plaintiff's injuries." *Baker v. City of Ottumwa,* 560 N.W.2d 578, 583 (Iowa 1997). In this case, Broadlawns points to Gerald's homicidal act as the sole proximate cause of Jillene's injury and her death. Broadlawns has the burden of proof on this defense. *Id.* For the reasons indicated in our discussion of superseding or intervening cause, we do not believe that Broadlawns met its burden on this issue.

### 6. Damages.

### A. Pre-death Physical and Mental Pain and Suffering.

■■■■ We have long acknowledged that "[p]ain and suffering damages are compensable even if the injured person was not conscious for an extended period of time." *Kuta v. Newberg,* 600 N.W.2d 280, 285 (Iowa 1999); *see also Lang v. City of Des Moines,* 294 N.W.2d 557, 562 (Iowa 1980); *Schlichte v. Franklin Troy Trucks,* 265 N.W.2d 725, 727 (Iowa 1978); *Hurtig v. Bjork,* 258 Iowa 155, 162, 138 N.W.2d 62, 66 (1965). Such damages "may not be recovered 'if death or unconsciousness is instantaneous,' but 'if substantial evidence shows the decedent did suffer pain the item is submissible although the period of consciousness was not protracted.'" *Kuta,* 600 N.W.2d at 285 (citation omitted). Ultimately, "[t]he issue is whether [the injured party] was sufficiently conscious in extent and time that reasonable minds could differ as to whether he suffered pain." *Schlichte,* 265 N.W.2d at 727.

The jury awarded the Estate a total of $100,000 for Jillene's physical and mental pain and suffering from the date of her injury to the date of her death. Unfortunately, the term "date" in the description of the period of Jillene's survival is deceptive: it is highly likely that she survived only moments from her injury to her pass-ing. As explained by Dr. Francis Garrity, the Polk County medical examiner and the lone medical expert testifying in the trial on this issue, Jillene likely was shot first in the head:

A. ... As far as the range of or order of firing is concerned, I think it's reasonable to speculate—and I emphasize this is speculation—that the first shot likely, although I can't prove it, likely was the shot to the face. Or the head shot. And I say that because there was relatively little blood or bleeding associated with the wounds to the chest even though those bullet holes went through the heart and the aorta. As I recall, there was just over 100 cc's of blood—that's a half cup of water—in the chest compartment where at least three bullet paths made their way. . . .

. . .

Q. Let me ask you this, Doctor Garrity. What type of pain or what type of reaction would one have when being shot with a gun? A. I think it depends on the location of the body. A shot to the head, of course, is going to result in immediate incapacitation, immediate unconsciousness, and oftentimes immediate death. . . .

. . .

Q. I understand, Doctor Garrity, that it is, in fact, your opinion that Jill Long was not unconscious immediately? . . . Do you have any recollection or knowledge of that? A. It's vague. No, I don't, actually. And if the first shot was a shot to the head it means incapacitation, instant incapacitation, but not necessarily a death right away. Death may follow within minutes, hours or in fact may follow it in days in the hospital. We know historically that she died at the scene shortly thereafter. So there is no question that she was incapacitated immediately following the incident. And

may have died instantly. Again, it's somewhat speculative. But there is no way—she at least survived for a short period of time, enough to bleed somewhat in the lung. Now, if she died right away it seems to me there would have been no evidence of any hemorrhage in the chest.

Considering the standards for the award of pre-death mental and physical pain and suffering in relation to the testimony elicited by the plaintiff at trial, we believe that damages for Jillene's pre-death pain and suffering were not warranted in this case.

■ Damages for pre-death mental and physical pain and suffering "may not be recovered 'if death or unconsciousness is instantaneous.'" *Kuta*, 600 N.W.2d at 285 (citation omitted). The testimony of the medical expert in this case indicated it was likely that Jillene was shot first in the head, a wound that would result in "immediate incapacitation, immediate unconsciousness, and oftentimes immediate death." The bullet entered the left cheek area of her face, and traveled at a sharp angle up into her brain. The Estate had the burden to show by substantial evidence that Jillene was "sufficiently conscious in extent and time that reasonable minds could differ as to whether [she] suffered pain." *Schlichte*, 265 N.W.2d at 727.

However, the evidence indicated the opposite: that Jillene likely, and mercifully, suffered immediate unconsciousness.[7] Thus, damages for pre-death mental and physical pain and suffering were not warranted under the facts of this case, contrary to the conclusion of the jury and the district court.

### B. Correct Measure of Damages.

■ Broadlawns asserts that the district court sanctioned the use of an incorrect measure of damages by submitting the Estate's economic damages claim to the jury premised on misguided testimony by the Estate's damages expert. As we have observed on numerous occasions,

[o]ne of the elements of damage in a wrongful death action is the present worth or value of the estate which decedent would reasonably be expected to have saved and accumulated as a result of his or her efforts between the time of death and the end of his or her natural life had he or she lived.

*Iowa–Des Moines Nat'l Bank v. Schwerman Trucking Co.*, 288 N.W.2d 198, 201 (Iowa 1980); *see also State v. Mayberry*, 415 N.W.2d 644, 645 (Iowa 1987). Broadlawns believes that the Estate's expert improperly determined "the present worth or value of the estate" based solely on

---

7. The parties did not focus on the possibility that Jillene suffered mental pain and suffering in the period between the moment she entered the home and the moment she was shot by Gerald. We are sympathetic to the terror that a victim of domestic violence such as Jillene might feel upon being confronted by an abuser, and the emotional suffering that could be experienced prior to the infliction of physical pain and suffering. However, we do not believe there is substantial evidence to support the jury verdict for mental pain and suffering for this window of time in this case.

Ultimately, there was limited evidence presented by the Estate describing the series of events on the night of Jillene's murder. *See*

*Schlichte v. Franklin Troy Trucks*, 265 N.W.2d 725, 727 (Iowa 1978). The primary investigating police officer stated that Jillene's car was left parked and running outside of the home. Based on the location of Jillene's body, it appeared she fell directly inside the home's doorway after she was shot. Groceries that Jillene had apparently been taking into the home were found next to her body. These circumstances led the officer to surmise that Jillene "walked in the door and was immediately shot." Given the evidence presented, we do not believe damages for pre-death mental pain and suffering for the period between entry into the home and injury were available.

Jillene's earnings or wage loss, a practice this court condemns. *See Booth v. Gen. Mills,* 243 Iowa 206, 211, 49 N.W.2d 561, 563 (1951). However, we do not believe this practice was invoked in this case. A close reading of the expert's testimony indicates his conclusions were based on calculations that went beyond Jillene's earnings or wage loss:

> Q. Okay. Now earlier we talked about adjustments that needed to be made for taxes, consumption and the like. We all pay taxes, we all spend, we all spend on ourselves. After computing and deducting all of those adjustments, what have you computed would be the present value of the total future loss to Jill Long's estate as a result of her death? A. The total future loss would be 444,909—scratch that $910. 4449—I am still—saying $444,910.

Based on this testimony, the district court was correct in determining that this issue was properly submitted to the jury.

### C. Punitive Damages.

█ Punitive damages may be awarded when it is proven "by a preponderance of clear, convincing, and satisfactory evidence" that "a party act[ed] with actual or legal malice" toward another party. Iowa Code § 668A.1 (1997); *Schultz v. Security Nat. Bank,* 583 N.W.2d 886, 888 (Iowa 1998) (citation omitted). "Actual malice is shown by such things as personal spite, hatred, or ill will." *Schultz,* 583 N.W.2d at 888. Legal malice, on the other hand, "is established by showing wrongful conduct committed with a willful or reckless disregard for the rights of another." *Id.; see also Beeman v. Manville Corp. Asbestos*

*Disease Comp. Fund,* 496 N.W.2d 247, 255 (Iowa 1993).

The jury awarded the Estate $1,000,000 in punitive damages based on its conclusion that the conduct of Dr. Shin constituted willful and wanton disregard for Jillene's rights or safety. This damages award was challenged by Broadlawns' motion for judgment notwithstanding the verdict. The district court concluded, even viewing "the evidence in a light most favorable to [the Estate,] ... Plaintiff failed to present any evidence [proving] willful or wanton conduct" thus necessitating the court's conclusion that "the jury improperly imposed punitive damages." The Estate appeals from this portion of the district court's ruling on the motion for judgment notwithstanding the verdict, arguing that it presented substantial evidence that Dr. Shin acted willfully and wantonly in relation to Jillene.

After a close examination of the record, we agree with the determination of the district court on this count. When viewing the evidence in a light most favorable to the Estate, there appears to be evidence in the record that someone was negligent in failing to carry out a promise made to Jillene to warn of Gerald's discharge. However, the Estate's case is based largely on an allegation of a single negligent act: failing to promptly notify Jillene. There is scant evidence that Dr. Shin's actions amounted to a "persistent course of conduct" showing no care and "disregard for the consequences" or, alternatively, "personal spite, hatred, or ill will" toward Jillene.[8] *Beeman,* 496 N.W.2d at 255;

---

8. In addition to finding scant evidence in the record warranting punitive damages against Dr. Shin, we also find *no* evidence that Dr. Shin conveyed or ordered the conveyance of a promise to notify Jillene of Gerald's discharge. Indeed, the evidence indicates that Dr. Shin never even spoke with Jillene, much less made any representations to her:

> Q. And as I understand it, you didn't directly talk with Jillene Long, Charlyn Dowling–Smith did, is that right? A. Yes.

*Schultz,* 583 N.W.2d at 888. Thus, punitive damages were not warranted under the facts of this case and the district court was correct in so concluding.[9]

### III. Broadlawns' Motion for New Trial.

■■■ We review the denial of a motion for new trial based on the grounds asserted in the motion. *Roling,* 596 N.W.2d at 76; Iowa R.App. P. 6.4. "[I]f the motion is based on a legal question, our review is on error," but if "the motion is based on a discretionary ground, we review it for an abuse of discretion." *Roling,* 596 N.W.2d at 76.

■■■ In reviewing discretionary matters, we give significant deference to the district court's decision whether to grant the motion. *Condon Auto Sales & Serv., Inc. v. Crick,* 604 N.W.2d 587, 594 (Iowa 1999). However, the district court's decision must not be arbitrary and "must have some support in the record." *Id.* Ultimately, "we are reluctant to interfere with a jury verdict" or the district court's consideration of a motion for new trial made in response to the verdict. *Id.*

### 1. Admissibility of Challenged Hearsay.

■■■ Broadlawns argues that the district court erred in admitting a number of hearsay statements made by one of the Estate's witnesses. We review the admission of an alleged hearsay statement for correction of errors at law. *McElroy v. State,* 637 N.W.2d 488, 493 (Iowa 2001). To determine the admissibility of such a statement, we consider "the purposes for which the alleged hearsay testimony was offered." *State v. Sowder,* 394 N.W.2d 368, 371 (Iowa 1986); *see also State v. Belken,* 633 N.W.2d 786, 801 (Iowa 2001); *State v. Deases,* 518 N.W.2d 784, 792 (Iowa 1994); *State v. Hollins,* 397 N.W.2d 701, 705–06 (Iowa 1986). In making this analysis, we make "an objective finding based on the facts and circumstances developed by the record." *Sowder,* 394 N.W.2d at 371. "If, on a review of the record, the evidence is deemed relevant and otherwise admissible for the purpose for which it supposedly was offered, then that purpose is supported objectively in the record and will be accepted." *Hollins,* 397 N.W.2d at 706.

■■■ In the absence of an objectively valid purpose, the testimony, even if offered for what appeared to be a proper purpose, must be excluded. *See* Iowa R. Evid. 5.802. Prejudice is presumed in cases in which hearsay testimony is improperly offered unless it is affirmatively established that the opponent of the proffered testimony has suffered no prejudice. *Sowder,* 394 N.W.2d at 372. However, "where substantially the same evidence is in the record, erroneously admitted evi-

---

Q. And in terms of the interaction with Charlyn Dowling—I am sorry—with Jillene Long you relied on Charlyn Dowling–Smith to have the communication? A. Yes.

This lack of evidence of any promise by Dr. Shin would not only serve as an alternative ground to reject an award of punitive damages, but reveals the lack of evidence to support a finding of any underlying liability against her under the proper theory submitted to the jury. Broadlawns and Dr. Shin generally challenged the legal basis for liability on appeal, and the absence of substantial evidence in the record to support a promise by Dr. Shin reveals the underlying judgment cannot stand against her individually. Accordingly, on remand we direct that the judgment be modified to dismiss Dr. Shin.

9. Our conclusion that punitive damages were unwarranted in this case makes it unnecessary to address Broadlawns' additional argument that Iowa Code section 670.4 (1997) otherwise bars punitive damages against Dr. Shin.

dence will not be considered prejudicial." *Id.*

Broadlawns believes that a number of statements made by Jillene's mother (also the estate's administrator), Dolores Smith, while testifying in the trial, constitute inadmissible hearsay. In its estimation, Dolores' testimony could only have been offered for the purpose of establishing that Broadlawns undertook the duty to notify Jillene of Gerald's discharge from the facility. The Estate counters that Dolores' testimony was offered for the purpose of establishing Jillene's state of mind during the week in which Gerald was shuttled between the hospitals. Thus, if the testimony was garnered for this purpose, the statements offered through Dolores' testimony would be admissible hearsay under the "state of mind" exception to the hearsay rule. Iowa R. Evid. 5.803(3).

There were a number of statements made by Dolores while testifying concerning a promise by Broadlawns to notify Jillene of Gerald's discharge, generally stated in terms such as "Broadlawns told Jillene" or "Jillene told me," that provoked an objection from Broadlawns. These statements were offered for the truth of the matter asserted therein: particular statements of fact made by Broadlawns to Jillene and particular statements of fact that Jillene made to her mother. For obvious reasons, Jillene was unable to convey these statements to the jury personally. Instead, the statements were offered through her mother's testimony. For these reasons, the statements were hearsay. Iowa R. Evid. 5.801(c). Consequently, they could only be admitted under one of our recognized exceptions to our rule against hearsay.

As explained at length already, this case was properly approached under the principles of duty described in Restatement (Second) of Torts section 323. One of the methods by which a party may show liability under section 323 is to establish that "the harm [to the plaintiff] is suffered because of [her] reliance upon the undertaking." Restatement (Second) of Torts § 323. We believe that each of Dolores' statements, examined in context with the whole of her testimony and the record as developed, indicate that they were offered for the purpose of establishing Jillene's state of mind during the week in which the statements were made which led to her reliance on Broadlawns' assertions. As such, Jillene's statements fall under the "state of mind" exception to the hearsay rule and are relevant to the issues at trial. Iowa R. Evid. 5.803(3).

■ Moreover, the record as a whole does not reveal any prejudice from the admission of Dolores' testimony. In addition to eliciting testimony from Dolores, the Estate also elicited testimony from Charlyn Dowling–Smith, Gerald's social worker during his time at Broadlawns. Charyln spoke with Jillene during the week of Gerald's treatment and her testimony provided strong evidence that Broadlawns had promised to notify Jillene of Gerald's discharge. Charlyn's testimony presaged that of Dolores, and Broadlawns did not object to Charlyn's statements relating to any promised notification. For that reason, substantially the same evidence as that later garnered from Dolores was already in the record when she testified. *Sowder*, 394 N.W.2d at 372. Therefore, even if Dolores' testimony was erroneously admitted, it was not prejudicial. *Id.*

## 2. Admissibility of Color Photographs.

■ Broadlawns also argues that the admission of photographs of the crime scene and nude color photographs of Jillene's body taken at her autopsy should

have been excluded by the district court because (1) the admission of the photographs was prejudicial and inflamed the jury against Broadlawns and (2) the photographs were not relevant to any issue that was properly before the jury, including damages for pre-death physical and mental pain and suffering. For its part, the Estate claims that the photos were properly provided as an illustrative tool to assist the jury in assessing the testimony of the investigating police officer and Dr. Garrity, both of whom provided testimony relevant to the issue of Jillene's pre-death pain and suffering.

We have long subscribed to the principle that,

> in regard to photographs ... their admission or exclusion rests largely in the discretion of the district court since it has the opportunity to examine the photographs and hear the evidence given by the witness who identifies them and describes what they show or do not show.

*Twyford v. Weber,* 220 N.W.2d 919, 924 (Iowa 1974). This is more clearly the case where photographs " 'are intended to perform the office of an illustration or diagram in aid of oral or written testimony, rather than as being in themselves independent evidence.' " *Id.* at 925. (citation omitted). Ultimately, "[t]he fact photographs and slides may be gruesome or tend to create sympathy does not render them inadmissible if there is just reason for their admission." *Id.* at 926.

As we previously explained, we do not believe damages for pre-death pain and suffering were warranted in this case. For this reason, the photographs were not relevant to any issue properly before the jury and there was no "just reason for their admission." *Id.* Thus, the district court's admission of the photos of Jillene amounted to an abuse of discretion. We do not believe, however, that the admission of the photographs amounts to reversible error. This conclusion rests on an examination of the damages ultimately awarded by the jury.

The jury awarded damages in four distinct categories: (1) present worth of the value of the Estate, (2) pre-death physical pain and suffering, (3) pre-death mental pain and suffering, and (4) punitive damages. We will not interfere with a jury's damages award unless "it is (1) flagrantly excessive or inadequate, or (2) shocks the conscience or sense of justice, or (3) raises a presumption it is the result of passion, prejudice or other ulterior motive, or (4) *lacks evidential support.*' " *Revere Transducers, Inc. v. Deere & Co.,* 595 N.W.2d 751, 769 (Iowa 1999) (citation omitted). The district court set aside the punitive damages award and our opinion sets aside the award of pre-death physical and mental pain and suffering damages because all three of these categories of damages "lack[ed] evidential support." *See id.*

The only damages remaining were awarded for the present worth of the Estate. We thus examine that award to determine whether it had substantial evidentiary support in the record, for " '[i]f the verdict has support in the evidence the [other factors, including prejudice,] will hardly arise.' " *Miller v. Young,* 168 N.W.2d 45, 53 (Iowa 1969) (citation omitted). We believe that the award of present worth damages had substantial evidentiary support provided by the testimony of the Estate's damages expert. Thus, we do not believe that Broadlawns suffered prejudice even though the admission of the photographs was an abuse of discretion. We conclude that the district court's error on this issue does not require reversal.

### 3. Admissibility of Complete Autopsy.

Broadlawns also believes that the district court erred in admitting only a

redacted version of Dr. Garrity's report from Jillene's autopsy. The portion excluded by the district court included the toxicology results produced after testing Jillene's blood and urine. Those results indicated that Jillene had certain amounts of methamphetamine and amphetamine in her system at the time of her death. Broadlawns argued that this information was relevant because the Estate was requesting future damages and the "decedent's ... sobriety or intemperance ... and other personal characteristics that are of assistance in securing business or earning money" are relevant to the determination of such damages. *Iowa–Des Moines Nat'l Bank,* 288 N.W.2d at 201; *see also Ward v. Loomis Bros., Inc.,* 532 N.W.2d 807, 811 (Iowa Ct.App.1995) (upholding trial court decision permitting the admission of evidence of litigants' extensive marijuana use).

Even if certain evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice" arising from its admission. Iowa R. Evid. 5.403. Although Jillene's toxicology information may have been relevant to the issue of her future damages, we agree with the district court's conclusion that the admission of the toxicology information ran the risk of unfair prejudice to the Estate. *See Iowa–Des Moines Nat'l Bank,* 288 N.W.2d at 201; Iowa R. Evid. 5.403. The information contained in the complete autopsy report likely would have had significant prejudicial effect on the jury's view of Jillene. The effect of this evidence may have been to cause the jury to look past Jillene's sobriety or intemperance as an influence on her future well-being to instead focus on Jillene as a "drug addict." Additionally, the probative value of the evidence is marginal. Broadlawns made no offer of proof and did not point to other evidence that would suggest Jillene regularly used illegal drugs. Balancing the probative value of the evidence against its possible prejudicial effect leads us to believe that the district court did not abuse its discretion in excluding this evidence.

### 4. Jury Instructions.

Broadlawns' motion for new trial raised several issues related to jury instructions. Our review of such issues is for errors at law. *McElroy,* 637 N.W.2d at 493.

### A. Jury Instruction No. 15.

In actuality, both Broadlawns and the Estate challenge the submission of Jury Instruction No. 15, which laid out for the jury the principles of negligence to be applied in considering the evidence presented in the case. As previously discussed, this case was properly framed under the principles of Restatement (Second) of Torts section 323. For this reason, the use of Jury Instruction No. 15, which incorporates section 323, was entirely permissible. Therefore, we deny both Broadlawns' and the Estate's challenges to this instruction.

Moreover, we find none of the additional infirmities in the instruction that Broadlawns asserts are present, including (1) that the instruction was unduly compound, repetitious, or duplicative, (2) that it placed undue emphasis on the Estate's case, or (3) that the instruction was unduly complex. We believe the instruction adequately and accurately described the duty principles arising under section 323 and find no error in its submission to the jury.

### B. Additional Jury Instructions Requested by Broadlawns.

Broadlawns argues that a number of jury instructions or interrogatories were impermissibly excluded from submission to the jury. We have previously observed

that "[r]equested instructions that are not related to the factual issues to be decided by the jury should not be submitted even though they may set out a correct statement of the law." *Vachon v. Broadlawns Med. Found.*, 490 N.W.2d 820, 822 (1992). Moreover, "[t]he submission of instructions upon issues that have no support in the evidence is error." *Id.* However, "[e]rror in giving or refusing to give an instruction does not warrant reversal unless the error is prejudicial." *Id.*

Broadlawns believes it was entitled to jury instructions on sole proximate cause and Jillene's knowledge of the danger posed by Gerald as well as special interrogatories relating to the jury's consideration of the details of the promise provided to Jillene. As we have explained, both the sole proximate cause issue and the knowledge of danger issue were correctly decided by the district court. Accordingly, the district court's decision to exclude instructions on those issues was also correct. We also do not believe that the court committed reversible error by excluding the special interrogatories suggested by Broadlawns. Although the interrogatories may have clarified some matters before the jury, the exclusion of the requested interrogatories was not prejudicial to Broadlawns. *See id.*

### C. Damages Instructions.

Broadlawns also asserts that the district court incorrectly submitted a number of damages instructions that lacked factual or legal basis. Broadlawns challenges instructions provided on punitive damages, pre-death pain and suffering and pre-death loss of function of mind and body, and present worth of the estate. We previously found no error on another issue relating to the present worth of the estate, and we likewise find no error in submitting the instruction relating to this issue. We also

note that the district court properly set aside the jury's punitive damages verdict, and we have determined that damages for pre-death pain and suffering should likewise be set aside. Although these rulings undermine the submission of jury instructions on those topics, the review process has alleviated any prejudice that would otherwise result from submitting instructions on those topics. Finally, we do not believe that Broadlawns suffered prejudice due to the submission of an instruction relating to pre-death loss of function of mind and body. *See id.* For each of these reasons, we find no reversible error on the issue of the damages instructions submitted to the jury.

### 5. Denial of a Fair Trial.

The final assertion made by Broadlawns is that a number of factors combined to deny the defendants a fair trial in this case. Specifically, it points to five separate events it believes evidence this denial: (1) the district court's admonishment of defense counsel and curative instruction to the jury relating to the status of a warrant for Gerald's arrest, (2) the hostile atmosphere in which defense counsel made a record on the proposed jury instructions, (3) an improper delay by the district court in deciding Broadlawns' motion for directed verdict, (4) the district court's later reversal of an objection made during defense counsel's closing argument, and (5) the submission of a punitive damages claim without sufficient evidence to support the claim. Trial courts have discretion to grant a new trial when "the verdict fails to administer substantial justice" and a party has not received a fair trial. *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 144 (Iowa 1996); *White v. Walstrom*, 254 Iowa 646, 651–52, 118 N.W.2d 578, 582 (1962). Our review is for an abuse of discretion. *Wilson*, 558 N.W.2d at 144.

We have previously observed, "the first requirement for the administration of justice is a court which acts with what Edmund Burke called 'the cold neutrality of an impartial judge.'" *State v. Iowa Dist. Ct.*, 568 N.W.2d 505, 509 (Iowa 1997) (citation omitted). It follows that, "a trial court may not telegraph to a jury, by purposeful exclamations, gestures or facial expressions, his approval or disapproval, belief or disbelief, in the testimony of witnesses or arguments of counsel." *State v. Larmond*, 244 N.W.2d 233, 236 (Iowa 1976). Above all else, the trial court should not exhibit a "deprecatory and hostile attitude" or "partisan zeal" toward any party in any case before the bench. *Id.*

We do not believe that a "deprecatory and hostile attitude" or "partisan zeal" was shown by the district court in this case. Some of the actions alleged by Broadlawns as indicative of an unfair trial occurred outside of the presence of the jury. Those that did not, or that involved the direct submission of particular issues to the jury, did not prejudice the defense to a level constituting reversible error. Every person involved in the litigation underlying this appeal was clearly placed under intense pressure exacerbated by the extended period of time over which this case was tried. Under the circumstances, each person involved—the judge, the jury, counsel, and others—performed admirably. We do not believe that Broadlawns was denied a fair trial in this case.

### IV. Conclusion.

We affirm the decision of the district court on the issues presented except in two respects. Our first disagreement concerns the submission of the damages claim for pre-death mental and physical pain and suffering, which we find was not supported by the evidence. Related to that submission was the admission of color photographs offered to illustrate the testimony of the primary investigating officer and the Estates' medical expert. We conclude that the admission of the photographs was not prejudicial to Broadlawns even though the photos were not relevant to any issue properly before the jury. Pre-death pain and suffering damages were considered and determined separately by the jury. Therefore, we modify the judgment by setting aside the $100,000 award for pre-death pain and suffering and dismissing the claim against Dr. Shin. We remand to the district court for entry of the judgment as modified by this opinion.

**AFFIRMED AS MODIFIED AND REMANDED.**