# IN THE COURT OF APPEALS OF IOWA

No. 22-0479
Filed April 26, 2023

ESTATE OF STEVEN ANDERSON, by its Executor DEBRA ANDERSON, Individually,
    Plaintiff-Appellant,

vs.

PRAVEEN PRASAD, M.D., and IOWA SURGERY CENTER, P.C.,
    Defendants-Appellees.
_____

Appeal from the Iowa District Court for Polk County, William P. Kelly, Judge.

The Estate of Steven Anderson appeals from an adverse judgment in this medical malpractice case against Praveen Prasad and the Iowa Surgery Center. **AFFIRMED.**

Jim Duff and Thomas J. Duff of Duff Law Firm, P.L.C., West Des Moines, for appellant.

Cathy S. Trent-Vilim and Frederick T. Harris of Lamson Dugan & Murray LLP, West Des Moines, for appellees.

Heard by Bower, C.J., and Ahlers and Buller, JJ.

**BOWER, Chief Judge.**

The Estate of Steven Anderson ("Estate") appeals from an adverse judgment in this medical malpractice case against Praveen Prasad, M.D., and the Iowa Surgery Center, P.C., claiming the district court abused its discretion in allowing Dr. Prasad to testify regarding the standard of care when he was not designated as an expert under Iowa Code section 668.11 (2019). Finding no error of law or abuse of the court's discretion in ruling on evidentiary matters, we affirm.

## I. Background Facts and Proceedings.

Steven Anderson went to the hospital complaining of abdominal pain on Friday, August 18, 2017. He was jaundiced. Medical personnel determined Anderson had a gallstone blocking his common bile duct and an infection. On August 19, Dr. Verma, a gastroenterologist, performed an endoscopic retrograde cholangiopancreatogram (ERCP) and was able to break some particles off the large stone in the duct and remove them.[1] But, the duct remained blocked, and a stent was inserted to allow the bile (and pus) to drain to the intestines.[2]

On Monday, August 21, Dr. Prasad, a general surgeon employed by Iowa Surgery Center, performed a laparoscopic cholecystectomy, that is, gallbladder removal surgery.[3] Anderson died from complications on September 5.

---

[1] The ERCP involves "put[ting] a scope down into the stomach, beginning part of the duodenum," to inject dye into the bile duct. The doctor will "either crush the stone, using baskets to pull it out, or sometimes they laser it."

[2] Dr. Verma noted the extensive dilation of the duct and a retained gall stone.

[3] Rather than an "open procedure" where the surgeon makes a large cut and performs the surgery in the opening, laparoscopic surgery involves making several small cuts through which surgical instruments and a camera are inserted into the patient. The camera is hooked to a monitor allowing the surgeon to see and perform the surgery.

The Estate filed suit against Dr. Prasad and the Iowa Surgery Center (collectively, the "defendants"), alleging Dr. Prasad was negligent in performing the gallbladder removal, which caused Anderson's death. Both sides designated experts pursuant to section 668.11; the Estate named Dr. Samuel Feinberg, and the defendants designated Dr. Paul Severson as their medical expert on standard of care.[4]

Dr. Prasad denied the following statements sent as requests for admissions:

- "during Plaintiff-decedent [Steven] Anderson's August 21, 2017 cholecystectomy procedure Defendant Prasad violated the standard of care of a general surgeon";
- "the ligation of a patient's right hepatic artery during a cholecystectomy violates the standard of care for a general surgeon";
- "the failure to identify the ligation of a patient's right hepatic artery during a cholecystectomy violates the standard of care for a general surgeon";
- "the stapling of a patient's common bile duct during a cholecystectomy violates the standard of care for a general surgeon";
- "the failure to identify the stapling of a patient's common bile duct during a cholecystectomy violates the standard of care for a general surgeon";
- "the ligation of Plaintiff-decedent [Steven] Anderson's right hepatic artery and stapling of Plaintiff-decedent [Steven] Anderson's common bile duct—which occurred during Plaintiff-decedent Stephen Anderson's August 21, 2017 cholecystectomy procedure—caused Plaintiff-decedent [Steven] Anderson's death."

The parties filed motions in limine about the scope of Dr. Prasad's testimony. The court concluded Dr. Prasad "may testify as to the medical facts

---

[4] We do note that a released-defendant designated "all of Mr. Anderson's healthcare providers, including all physicians, therapists, physician assistants and nurses, and all other health care providers identified in the records concerning Steven Anderson, as potential expert witnesses concerning their diagnosis, treatment, opinions on causation reached in the course of treating the patient, and nature extent and scope of alleged damages."

regarding his care of Mr. Anderson during the laparoscopic surgery and that what he was doing was appropriate based on his opinions associated with treating his patient, Mr. Anderson."

At trial, the Estate's expert, Dr. Feinberg, testified Dr. Prasad violated the standard of care during Anderson's gallbladder removal surgery, which caused Anderson's death. Dr. Feinberg explained,

> What you're trying to do is, when you're doing the surgery, is get in the right area so that you can dissect out the structures so that you see the cystic duct and cystic artery. The whole object of the surgery is protect the common bile duct, protect the common hepatic duct. See only two structures that go to the gallbladder. You can safely remove it.

Dr. Feinberg testified Dr. Prasad clipped the right hepatic artery thinking it was the cystic artery.

> Q. And I think they used the word they "felt" it was the cystic artery.[5] When you're in surgeries, do you just feel that things might be something without exploring more? A. Well, especially with inflammation and you haven't gotten the anatomy down, no. The answer would be you want to see exactly what you're cutting.

Dr. Feinberg testified Dr. Prasad's "failure to appreciate the anatomy" was a violation of the standard of care; "The whole object of the cholangiogram is to orient you so that you know exactly where you are."

> Q. I'll ask another question here, Doctor. Dr. Prasad was— what sort of a procedure as far as the cholecystectomy—what type of cholecystectomy was he trying to do? A. He was trying to remove a subtotal or two-thirds, three-quarters of the gallbladder so that he would be safe to not injure the common hepatic duct or the hepatic artery.
> Q. So he's just trying to do a partial removal? A. That is correct.

---

[5] This description is from the postoperative report by Dr. Prasad and the assisting fifth-year resident, Dr. Nechtow.

Q. He's trying to do a partial removal. What did he actually remove? A. He removed the total gallbladder with the cystic duct.

Q. Does that violate the standard of care? A. If his object was to remove the gallbladder itself, then no. If he's only trying to remove part of the gallbladder and ends up removing the whole gallbladder, then yes.

Dr. Severson testified for the defense that Anderson had Mirizzi syndrome, "a very unusual condition" where the "patient [is] infected in the bile ducts due to obstruction of a stone and develop[s] what we call ascending cholangitis—that's an infection where pus gets in the bile duct—it's an extremely dangerous infection."[6] Dr. Severson testified there are four stages of Mirizzi syndrome. In stage four, a stone that has been trapped in the common bile duct ulcerates through the wall of the duct. In Dr. Severson's opinion, Anderson was Mirizzi stage four.

Dr. Severson testified the interoperative cholangiogram was done "to try to delineate the anatomy," which was difficult because "there was so much fibrous scarring." He stated, "The Mirizzi syndrome has created such dense scar tissue in the hepatocystic triangle that it's impossible to dissect. That is the definition of Mirizzi syndrome." A second interoperative cholangiogram was necessary—which happens "[v]ery rarely." But Dr. Prasad "needed to be absolutely sure about what the anatomy showed and where they could safely divide the infundibulum."

Dr. Severson took issue with Dr. Feinberg's interpretation of the cholangiogram:

---

[6] Dr. Severson testified, "The average surgeon does not [know about Mirizzi syndrome] because the incident is so low." The condition is "not well understood by the medical community" because it is seen in "[o]ne out of a thousand laparoscopic cholecystectomy cases."

Q. Do you have an understanding of where Dr. Feinberg thinks the dye first comes out? Or where the Kumar clamp is, let's start there. A. He thinks it was—he says that this clamp was across the common hepatic duct and the dye was directly injected into the common hepatic duct.

Q. How would it be directly injected if the needle is down in the cystic duct? A. It's impossible. There's no—the Kumar only has one needle that always comes out right here (indicating). It can only squirt out here (indicating). It can't squirt out here (indicating). That's the nature of the Kumar clamp.

Q. So if we played this one more time, when we had our eyes up on the end of the Kumar clamp, are we going to see dye coming out the end of that Kumar clamp and flowing in as Dr. Feinberg describes? A. Well, if he were somehow correct, which he couldn't be because there's no—you can always see the needle. That's why needles are metal. You can always see them. There's no needle up here and there never is a Kumar clamp. They always come out here indicating). You would have dye coming in like this and it would come backwards (indicating).

Q. And does it? A. That's what he says he saw. No, that's not the way it works.

Dr. Severson testified this three-hour surgery involved "great difficulties, many maneuvers, lots of steps and techniques trying to identify the anatomy and safely perform the surgery."

Q. And do you have an opinion as to whether those steps and techniques were appropriate? A. Yes.

Q. And why? What is that opinion? A. The opinion is that those were the appropriate steps.

Q. And why? A. Well, if you can't have a critical view of safety achieved because the area that we're supposed to start the dissection in, the triangle or the hepatocystic triangle—and that's impossible because it's all fused and it's scarred in—then the infundibular technique is very good and the recommended way for surgeons to be able to continue the operation and safely go around the infundibulum. Around the infundibulum, there really should be no major structures that can get the surgeon into trouble.

Dr. Severson stated Dr. Prasad performed a different surgery than originally planned, referring to it as a "bailout procedure," that is, "we just have to try to do our best and get out of the operating room today without trying to injure anything

serious." He stated the performance of a partial gallbladder removal "allows the doctor to take out the majority of the gallbladder, hopefully control the infection and the sepsis, and get the majority of the stones out. And you try to get the patient to survive the syndrome."

> Q. Was it appropriate for him to get those two cholangiograms? A. Yes, it was very appropriate.
> Q. And was it appropriate for Dr. Prasad to—was it appropriate to think that there was a long cystic duct there and be able to move your stapler closer to the common duct? A. There was a long cystic duct there. And I think it would have been very expected by most surgeons to be able to have leeway, to be able to move the stapler toward the duct.
> Q. And is that what a reasonable surgeon would do in this circumstance? A. Yes.

With respect to the injury to the hepatic artery, Dr. Severson opined:

> . . . [I]t's two potential things. . . . In Dr. Prasad's report, there's a mention of a clipping of what they thought was the artery. And I presume that it was somewhere in the normal anatomy, somewhere in here, and that they thought that it was the cystic artery. And it could have been right hepatic artery that was clipped at that time.
> Or, number two, it could have been just absolutely plastered and drawn up into the scar tissue mass, which is what happens one out of four times. That's the other possibility. The stapler came right across it also. With the same injury that took out those two ducts, could have been the right hepatic artery fused to the back of it, which they couldn't see.
> Q. Okay. And why can't they see that? A. It's all scarred in. It's just—you can't separate the structures. They are all encased by scar tissue.
> Q. Does the standard of care require the surgeon to try to separate them, to dig down into those—A. No.
> Q. Why not? A. Number one, it's dangerous. Number two, you can't. It's impossible. It's fused. It's all fused together.

Dr. Severson also testified it was not a violation of the standard of care to not immediately know a complication occurred during surgery.

Dr. Prasad testified, outlining how Anderson came to be his patient and why Anderson fell into the minority of those whose laparoscopic surgery could not be done on an outpatient basis. He explained the stones in Anderson's gallbladder necessitated its removal and if the gallbladder remained it would be a persistent source of infection and could lead to sepsis. Dr. Prasad requested Dr. Nechtow assist him with the procedure. He testified about the problems they encountered doing the surgery, including significant inflammation of the gallbladder that had caused the gallbladder to adhere to other structures. Dr. Prasad testified that when performing a laparoscopic cholecystectomy, it is preferred that the surgeon achieve a "critical view of safety," that is, freeing the gallbladder from all surrounding tissue to obtain a visual of two and only two structures attached to the gallbladder, the cystic duct and cystic artery, which need to be dissected before you remove the gallbladder. If not able to achieve the critical view of safety, the surgeon uses the infundibular technique. He testified he could not achieve a critical view of safety in Anderson's surgery and attempted the infundibular technique. Due to the severity of Anderson's inflammation, adhesions, and scar tissue, Dr. Prasad performed two cholangiograms to orient the surgery.

Dr. Prasad testified the gallbladder was removed from the abdominal cavity using an EndoCatch retrieval bag, which was then secured and removed.[7] The following exchange occurred:

> Q. Now, once you get it in this endo bag and it's outside of Mr. Anderson, what happens to the endo bag at that point? A. So we hand it over to our scrub nurse who is working with us, and she

---

[7] This EndoCatch bag is inserted through one of the ports and is "like a fishnet" in which the surgeon places the dissected gallbladder. The bag is closed off by pulling a thread and then removed from the body and sent to the lab.

gives it to the—there's another nurse in the room, circulating nurse. She takes it and she puts it in a container and that goes to the lab to be checked.

Q. Do you open that endo bag and look at the gallbladder at that point?  A. No.

Q. Would it look any different than what you've been seeing the entire surgery?  A. Yes, we don't look at it.  We don't open it.

Q. Have you ever opened the endo bag and looked at it? A.  No.

Q. Have you observed other surgeons, when they do laparoscopic cholecystectomies, open the endo bag?  A. No.

MR. THOMAS DUFF: I object.

THE COURT: Hold on a second, Doctor.

MR. THOMAS DUFF: I object to the question as asking about what other doctors do.  It's completely inappropriate, and I'd ask the witness's answer be stricken and that the jury be instructed to disregard it.

THE COURT: Doctor, you can answer if you have personal knowledge.

A. When I scrub in with other surgeons, as I mentioned before, I've never seen anybody open the bag to look at the gallbladder after it's been removed from the abdomen.

Q. (By Ms. Nelson) Did Dr. Nechtow open it to look at it? A. No.

Q. When you were in your surgical training, were you taught you should open the endo bag and look at the gallbladder?  A. No.

Q. When you teach residents, do you teach them to open that endo bag and look at the gallbladder?  A. No.

Dr. Prasad then testified about the complications Anderson experienced several days after surgery, which were handled by another doctor.  Dr. Prasad explained, "When we finished the operation, we knew that there was some oozing, which we took care of.  But short of that, the rest of the operation looked to have been—had just gone okay.  We didn't see any—yes, it looked like it was all right."  Dr. Prasad acknowledged that he learned after the surgery that the right hepatic artery had been clipped and ducts had been injured.

Over the Estate's strenuous objection, Dr. Prasad was allowed to answer the question whether he performed Anderson's surgery appropriately.  He testified:

Well, looking back at it, this operation, there were a few things. One is, I had a chief resident working with me, to help me with the case and to have another set of eyes. Number two, I took all the appropriate steps which I needed in the operation. I took my own time in dissecting. Normally gallbladders we can finish in, you know, over an hour or even less. But this one we took it slowly and carefully. Took us almost over three hours of operation. We were careful in dissecting because the tissue was thick and inflamed and friable. We made sure that we didn't do any—it was thick and it was friable, like it could tear.

And as recommended by most people, that if you cannot do the critical view of safety, you go to the other technique, the infundibular technique. And we did cholangiograms to get the anatomy more clearly. And I did not one but two cholangiograms so that I was sure that I was in the right area when I was cutting.

So based on all of these steps which I took and also the way I did the operation, I think I did the operation appropriately.

The Estate cross-examined Dr. Prasad and he acknowledged he learned after the fact that he had stapled the common bile duct and clipped the right hepatic artery during the surgery, though he had not intended to do so. After moving through questions about the surgical report and other medical personnel, Estate counsel turned to "questions about the consent form" and possible risks, which included bleeding and bowel and ductal injury.

During closing argument, the defense stated:

As I've said, the standard of care is what a reasonable surgeon does based on their training and their education in those circumstances.

Dr. Severson told you . . . the steps that Dr. Prasad took were careful and met the standard of care. They were what reasonable surgeons are taught to do, and they did not do what reasonable surgeons are taught not to do.

How about Dr. Prasad? He told you that I've done about a thousand lap choles in my career. That's a lot of surgeries. How many injuries has he had? This one, one out of a thousand. We know the complication rate. The known is three out of a thousand.
. . . .
He told you Mr. Anderson came to him. It was a very difficult case. He had all of these adhesions, all of this scar tissue. He told you a normal—whatever that might be—a normal lap chole takes

about an hour. He took a little over three hours. He told you, and it's documented, he took his time. Dr. Nechtow took his time. They did a very tedious dissection and went slowly and carefully.

And I submit to you that all of those combined, with what I just told you, will conclude that Dr. Prasad met the standard of care.

Now, Dr. Feinberg and the plaintiffs say Dr. Prasad should have caught his mistake during surgery. How? Well, he should have looked in that endo bag. Remember that Dr. Prasad had that purple stick with the little bag? He puts the gallbladder in it. And Dr. Feinberg said he should have opened that up and looked at it.

Well, first of all, Dr. Prasad says, I've never opened it up. I've never taught anybody to open it up. I've never observed anybody else opening it up.

Dr. Severson says, No, the standard of care doesn't require us to open that up. Why? Well, you might think common sense says, we'll open it and look at it. Dr. Prasad says, I've been looking at that gallbladder. I've got the scope in there. I'm looking at my monitors. I've seen this gallbladder for the last three hours. What am I going to see different when I open up that endo bag and look at it with my naked eye? Not my pathologist's eye, who's dissecting it and opening it up and saying the wall of the gallbladder is half a centimeter and this and that. He's looking at it with his naked eye, which is what he's been doing.

So the standard of care does not require him to look at that endo bag. What did Dr Severson say? Well, if he would have looked at it, it would look like nothing but a big mass of scar build-up. How is that going to help Dr. Prasad?

The law says that they have to prove he was negligent, that his steps were not reasonable. I took you through, with Dr. Prasad, this entire operative report and pointed out every single step he took. All of these green marks, step after step.

After a two-week trial, the case was submitted to the jury. By special verdict form, signed by seven of the eight jurors, the jury found Dr. Prasad was not negligent.

The Estate filed a motion for new trial, asserting the court had improperly allowed Dr. Prasad to opine on the standard of care even though he was not certified as an expert witness. The Estate summarized their claims as follows:

MR. JIM DUFF: Okay. Some of the testimony that Ms. Nelson was referencing regarding Dr. Prasad's testimony, first, the only time

he was asked whether or not his actions were appropriate was in that final direct question on direct examination.

I haven't had an opportunity, obviously, to reread it thoroughly, but I did a quick word search for "appropriate." Other than objections outside the presence of the jury, that question is the first time that was mentioned.

Also, testimony on the standard of care is virtually always based on somebody's personal experience. So personal experience and training in and of itself isn't appropriate. But when you are using that personal experience to opine about the appropriateness of the care, that's where—getting back to your original question—that's where it crosses the line.

And then also the questions where Mr. Tom Duff was asking Dr. Prasad about the standard of care, that was in the context of the informed consent form. And the point that was being made was that just because an informed consent form is signed doesn't mean you can perform the surgery negligently.

None of those questions were directed specifically at the surgery that was being performed in this case. They were sort of general questions about his duties to still perform the surgery properly.

And also those questions were asked on cross after that improper question had already been asked. So you can't open the door after the improper question has already taken place, an answer has already taken place.

And then as a final note here, the fact that these improper answers and testimony were repeated in closing, that is the source of the prejudice. It's not that, you know, she went over the top and Ms. Nelson, you know, mischaracterized his testimony, by any means. She did. She simply quoted what Dr. Prasad stated. However, that testimony was inappropriate. And by repeating it in closing, that's where you get that heightened source of prejudice.

In its ruling on the motion for new trial, the court concluded:

From the view from the bench Dr. Prasad gave technically expert opinion testimony. Although pushing the line, his opinions appeared to stay within the scope of his status as a treating surgeon dealing with allowed mental impressions contrasted with providing a standard of care conclusion.

In *Carson,* the Iowa Supreme court explained that "the paramount criterion" when considering the need for Iowa Code section 668.11 disclosure from treating physicians "is whether th[e] evidence, irrespective of whether technically expert opinion testimony, relates to facts and opinions arrived at by a physician in treating a patient or whether it represents expert opinion testimony formulated for purposes of issues in pending or anticipated litigation."

*Carson v. Webb*, 486 N.W.2d 278, 281 (Iowa 1992). Here, the doctor's testimony dealt with his idea of him addressing a complication as opposed to a breach of the standard of care. [The Estate] and their experts put up a great fight to try and meet their burden that Defendant was negligent but ultimately fairness was not impacted. A new trial is not warranted based on Dr. Prasad's expert opinion testimony.

The Estate appeals, asserting the trial court improperly allowed Dr. Prasad to opine on the standard of care during his direct examination, which error was compounded in closing argument when defense counsel pointed to Dr. Prasad's provided testimony when arguing there was no violation of the standard of care.

## II. Scope and Standard of Review.

"We review whether a district court properly admitted [or excluded] expert testimony for abuse of discretion." *McGrew v. Otoadese*, 969 N.W.2d 311, 319 (Iowa 2022) (citation omitted). We will not find an abuse of discretion unless the trial court exercises its discretion "on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Eisenhauer ex. rel. T.D. v. Henry Cnty. Health Ctr.*, 935 N.W.2d 1, 9 (Iowa 2019) (citation omitted). "Reversal of the district court is only required if the [Plaintiffs'] substantial rights were affected." *McGrew*, 969 N.W.2d at 325 (citation omitted).

## III. Discussion.

Iowa Code section 668.11 governs the "[d]isclosure of expert witnesses in liability cases involving licensed professionals," and provides:

> A party in a professional liability case brought against a licensed professional pursuant to this chapter who intends to call an expert witness of their own selection, shall certify to the court and all other parties the expert's name, qualifications and the purpose for calling the expert [within set time limits].

"Section 668.11 was 'designed to require plaintiffs to have their proof prepared at an early stage in the litigation in order to protect professionals from having to defend against frivolous suits' . . . ."  *Ronnfeldt v. Shelby Cnty. Chris A. Myrtue Mem'l Hosp.*, 984 N.W.2d 418, 426 (Iowa 2023) (citation omitted).

Our supreme court has explained that "the paramount criterion" when considering the need for section 668.11 disclosure from treating physicians "is whether th[e] evidence, irrespective of whether technically expert opinion testimony, relates to facts and opinions arrived at by a physician in treating a patient or whether it represents expert opinion testimony formulated for purposes of issues in pending or anticipated litigation."  *McGrew*, 969 N.W.2d at 319 (alteration in original) (quoting *Carson*, 486 N.W.2d at 281).  The line is "between opinions formed during treatment, which do not trigger an obligation to make an Iowa Code section 668.11 disclosure, and opinions formed during or in anticipation of litigation, which do."  *Id.* at 320.

The Estate asserts Dr. Prasad's testimony "crossed the line" into disclosure-required testimony in two instances: when Dr. Prasad characterized his care and treatment as "appropriate," and when he testified "about what other physicians do in similar circumstances."

The Estate's counsel asserted at trial and reasserts here that the defense's use of the word "appropriate" is "just another way of asking him whether he violated the standard of care."  In its reply brief, the Estate acknowledges that whether there is a breach of the standard of care is an objective inquiry and "technically" Dr. Prasad can testify to his subjective opinions but argues this is "infinitesimal hairsplitting."

Our focus is on whether Dr. Prasad's objected-to testimony "relates to facts and opinions arrived at by a physician in treating a patient or whether it represents expert opinion testimony formulated for purposes of issues in pending or anticipated litigation." *Id.* at 319.

The trial court determined Dr. Prasad's testimony did not cross the line into expert testimony requiring certification:

> Under Iowa law, a treating physician may permissibly testify to his or her factual knowledge, mental impressions and opinions that are developed during the course of the patient's treatment and not acquired or developed in anticipation of litigation or for trial. *Hansen v. Cent. Iowa Hosp. Corp.*, 686 N.W.2d 476, 481 (Iowa 2004). This is because the treating physician ordinarily learns facts in a case, and forms mental impressions or opinions, long before he or she is retained as an expert witness, and often before the parties themselves anticipate litigation. *Id.* Defendants briefed how Dr. Prasad's deposition testimony and trial testimony noted the care of Mr. Anderson. The key to this analysis is that it appears that his opinions are within the scope of his status as a treating surgeon and are not opinions that he developed after the fact for purposes of this litigation. The grey area is created here because his position as Defendant requires some after the fact review.
>
> The [Estate] have noted Dr. Prasad did mention what he has observed during other surgeries in those two particular examples. This court agrees with the Defendant[s'] argument that Dr. Prasad's subjective, personal, education and experience are not necessarily synonymous with the objective standard of care, i.e., the "degree of skill, care and learning ordinarily possessed and exercised by specialists in similar circumstances, and not merely the average skill and care of a general practitioner." Both [the Estate] and Defendant[s] had well qualified experts to provide the standard of what skill is exercised by specialists in similar circumstances as required in Jury Instruction No. 15. The court finds that there was not a conspicuous effort at trial that the Defendants equated the two. This court finds that Dr. Prasad testified as to what he did and what his experiences were that impacted his actions in this case. When Dr. Prasad was talking about his own personal observations of what others do, that was his observation. He had not seen other surgeons check the endobag. He had not seen other surgeons dig around the impacted area to identify tubular structures. Dr. Prasad did not testify to whether those meet the standard of care. He testified those

observations informed a basis for why he did what he did or did not do in Mr. Anderson's case.

Dr. Prasad's language regarding his treatment detailing whether all of the steps and techniques he used were "appropriate" provides facts to be evaluated for the standard of care. During trial it appeared in using the word "appropriate" he was dealing with his mental impressions. The jury could accept it or reject it. His testimony as a party opponent is judged on his credibility and how his description of the circumstances compare to the designated experts' description of the standard of care. Because of the nature of surgery and the technical expertise necessary to describe the surgery, I find that Dr. Prasad did not cross the line into standard of care expert testimony. In fact, one juror found that he was negligent in performing the laparoscopic cholecystectomy of Mr. Anderson in violation of the standard of care despite Dr. Prasad's mental impressions of what Dr. Prasad believed to be appropriate.

We conclude the court's reasons were neither clearly untenable or unreasonable.

As discussed in *McGrew*, the central issue is whether Dr. Prasad formed his opinion as a treater or in anticipation of trial. *See* 969 N.W.2d at 319–20. We agree with the trial court Dr. Prasad's testimony "relates to facts and opinions arrived at by a physician in treating a patient." It is true, Dr. Prasad was looking back at the surgery when answering whether he acted "appropriately." His after-surgery review he performed the surgery "appropriately" did not comment on whether he deviated from or acted consistently with accepted standards of care. We find no abuse of discretion in the trial court's allowing Dr. Prasad's testimony.

In any event, Dr. Severson testified at length before Dr. Prasad about the standard of care and why, in his opinion, Dr. Prasad's treatment of Anderson met the standard of care. Even if we were to find Dr. Prasad's testimony that he performed the surgery "appropriately" was testimony he did not breach the standard of care, Dr. Severson had already given the same testimony without objection. We do not find the admission of Dr. Prasad's opinion testimony was

prejudicial so as to warrant a new trial. *See Vasconez v. Mills*, 651 N.W.2d 48, 57 (Iowa 2002) (ruling even if testimony was admitted erroneously, reversal is not warranted if it is merely cumulative of other evidence); *see also Est. of Long v. Broadlawns Med. Ctr.*, 656 N.W.2d 71, 88–89 (Iowa 2002) (finding even if testimony was erroneously admitted, it came after substantially the same evidence had been admitted without objection and therefore was not prejudicial). Finding no abuse of discretion in the court's rulings, we affirm.

**AFFIRMED.**