**Uttam JAIN, Administrator of the Estate of Sanjay Jain, Deceased, Appellant,**

v.

**STATE of Iowa, Appellee.**

No. 98–800.

Supreme Court of Iowa.

Sept. 7, 2000.

Rehearing Denied Oct. 10, 2000.

---

Jay H. Honohan of Honohan, Epley, Braddock & Brenneman, Iowa City, for appellant.

Thomas J. Miller, Attorney General, and Charles S. Lavorato and Darrel L. Mullins, Assistant Attorneys General for appellee.

NEUMAN, Justice.

This appeal concerns the tragic death of Sanjay Jain, a freshman at the University of Iowa. Sanjay committed suicide in his dormitory room. His father and administrator of his estate, Uttam Jain, sued the university for wrongful death, claiming it negligently failed to exercise reasonable care and caution for Sanjay's safety. In particular he claimed that if the university had followed its policy of notifying parents of a student's self-destructive behavior, the suicide could have been prevented.

On the university's motion for summary judgment, the district court dismissed Uttam's suit. It concluded the university

owed no legal duty to Sanjay Jain to prevent him from harming himself, nor did it breach any legally recognized duty of care by failing to notify his parents of an earlier suicide attempt. For the reasons that follow, we affirm.

## I. Background Facts and Proceedings.

Sanjay Jain had just celebrated his eighteenth birthday when he enrolled as a freshman at the University of Iowa and moved into an off-campus university dormitory, the Mayflower. Sanjay came to Iowa from Addison, Illinois, the second of three children born to Uttam and Anita Jain. By all accounts they were a close-knit family.

Sanjay had enjoyed a successful academic career in high school and planned to major in biomedical engineering at the university. That course of study proved difficult. By the middle of the first semester his personal life as well as academic performance were showing the strain. He became moody and skipped many classes. He experimented with drugs and alcohol. In early November he was involved in an egg-throwing incident at the dormitory. He was penalized with three hours of compulsory community service. Soon after he was placed on one-year disciplinary probation for smoking marijuana in his room. Beth Merritt, the hall coordinator for the Mayflower dorm, imposed this discipline and ordered him to attend a series of alcohol and drug education classes.

Sanjay's parents and family were unaware of these difficulties. University policy calls for privacy with respect to the university's relationships with its adult students. Although Sanjay confided to his mother that he wished to switch his major from engineering to computer science, he told his father and brother that he liked biomedical engineering and his classes were going well. His frequent phone conversations with his parents were reportedly upbeat. Sanjay, in his father's words, described everything about college as "awesome."

In the early morning hours of November 20, 1994, resident assistants on duty at the Mayflower were called to a "domestic" dispute outside Sanjay's apartment. When they arrived they observed Sanjay and his girlfriend, Roopa, fighting over a set of keys to Sanjay's moped. Sanjay had moved the motorized cycle into his room. Roopa asserted that Sanjay was preparing to commit suicide by inhaling exhaust fumes and she was merely trying to stop him. Sanjay was interviewed independently. He, too, reported that he was trying to commit suicide. The RAs concluded from their conversation that Sanjay "had a lot of frustrations about family life and academics." After discussing the situation for about an hour, the group disbanded. Sanjay assured the RAs that he would seek counseling after getting a good night's rest.

Beth Merritt met with Sanjay the next day. He was reportedly evasive and refused to admit or deny that he had tried to commit suicide. She encouraged him to seek help at the university counseling service. She also demanded that he remove the moped from his room because storing it there violated university policy. He agreed to do so. Merritt also gave Sanjay her home phone number, urging him to call her "if he thought he was going to hurt himself." Sanjay assured her he would do so. He reportedly claimed that he just really needed to talk to his family and looked forward to doing so during the Thanksgiving break that would start the next day.

In keeping with university protocol, Merritt discussed the Sanjay incident with her supervisor, David Coleman, the assistant director for residence life. She expressed concern that the RA's incident report stated "Sanjay was trying to commit suicide by inhaling fumes of his scooter in an unventilated room" while Sanjay insisted the report "wasn't exactly the truth." She told Coleman that her person-

al conversation with Sanjay revealed more tiredness on his part than hopelessness or despair. She also advised Coleman that she requested permission to contact Sanjay's parents about the incident, but he refused to consent. Coleman concurred in Merritt's decision to encourage Sanjay to seek counseling. He took no further action on the matter.

Evidently Sanjay's visit with his family at Thanksgiving did not include discussion of the turmoil in his life. His parents and siblings perceived nothing amiss in his attitude or behavior. Sanjay returned to the university when classes resumed on November 28. Merritt encountered him briefly and inquired about how things were going. Sanjay responded "good." Unbeknownst to Merritt, however, the moped was back in Sanjay's room. In a statement given after Sanjay's death, his roommate, Scott, reported that the vehicle had been stored in Sanjay's room for roughly three weeks. Sanjay reportedly told Scott that "he would kill himself by running the cycle in the room . . . when Scott was not there."

This threat, apparently taken in jest by Scott, played out on December 4. Scott planned to spend the weekend in Cedar Rapids. Sanjay called his brother to make arrangements for a ride home over the upcoming winter break, then joined friends for a night of drinking downtown. They stayed until the bars closed at 2 a.m. Sanjay was described as "visibly intoxicated but coherent." His friends fed him sandwiches when they returned to the dorm. One friend was reportedly reluctant to leave him alone in his room, telling him she would post herself outside his door until Scott returned. Sanjay convinced her this was not necessary, and she retired to her room around 4 a.m.

At approximately 10:30 a.m., one of Sanjay's suite-mates awoke to the smell of something "unusual." He ignored it but, thirty minutes later, he felt dizzy when he tried to get up. He suspected the pilot light might have gone out on the apart-ment's stove. When he opened the door to the kitchen a cloud of exhaust smoke appeared there and in the bathroom. Fearing another suicide attempt by Sanjay, he knocked on his door but received no answer. All he heard was loud music coming from the room. He contacted the RA on duty, who unlocked the door and found Sanjay unconscious, the moped still running. Emergency medical personnel were summoned and the dormitory was evacuated. Sanjay was pronounced dead of self-inflicted carbon monoxide poisoning.

The record reveals that an unwritten university policy dealing with self-destructive behavior dictates that, with evidence of a suicide attempt, university officials will contact a student's parents. The decision to do so rests solely with Phillip Jones, the dean of students. The dean bases his decision on information gathered from a variety of sources. In this case, no information concerning Sanjay Jain was transmitted to the dean's office until after his death.

Plaintiff Uttam Jain commenced this wrongful death action against the university in accordance with the "state agency" provisions of the State Tort Claims Act. See Iowa Code § 669.2 (1995). The suit claimed that Sanjay's death proximately resulted from university employees' negligent failure to exercise care and caution for his safety. The State generally denied the claims and asserted, by way of affirmative defenses, the doctrine of superseding-intervening cause and the discretionary function exemption to the State's waiver of sovereign immunity. Extensive discovery ensued. By the close of discovery, the only specification of negligence seriously advanced by plaintiff was his claim that Sanjay's death resulted from the university's failure to notify his parents of his earlier suicide attempt.

The State moved for summary judgment. Following a hearing, the district court ruled that (1) no special relationship existed between the university and Sanjay

that would give rise to an affirmative duty to prevent his suicide, (2) by adopting a policy of notifying parents of a student's suicide attempt, the university did not thereby assume a voluntary duty to prevent Sanjay's self-inflicted death, and (3) the facts, viewed in the light most favorable to the plaintiff, do not establish an exception to the general rule that suicide is an intentional intervening act which supersedes any alleged negligence by the defendant. The court therefore concluded the State was entitled to judgment as a matter of law. This appeal by plaintiff followed.

## II. Scope of Review.

■ Well-settled rules define the scope of our review on appeal from an order granting summary judgment:

> Our review is at law. Summary judgment is proper only when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. To determine whether a genuine issue of material fact exists, the court must examine the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. The burden is on the moving party to show the absence of a material fact issue, and the resisting party is accorded all possible inferences reasonably deducible from the evidence. On appeal, our task is to determine whether a genuine issue of material fact exists and whether the law was correctly applied.

*Red Giant Oil Co. v. Lawlor,* 528 N.W.2d 524, 528 (Iowa 1995) (citations omitted). While negligence actions ordinarily do not lend themselves to resolution by summary judgment, a threshold determination in any suit based on negligence is whether the defendant owed the plaintiff a legally recognized duty of care. *Leonard v. State,* 491 N.W.2d 508, 509 (Iowa 1992). "Whether, under a given set of facts, such a duty exists is a question of law." *Id.*

With these principles in mind, we turn to the assignments of error urged by the plaintiff.

## III. Issues on Appeal.

■ *Overview.* At the outset plaintiff concedes that the law generally imposes no duty upon an individual to protect another person from self-inflicted harm in the absence of a "special relationship," usually custodial in nature. Restatement (Second) of Torts § 314, at 116 (1965); *see Cutler v. Klass, Whicher & Mishne,* 473 N.W.2d 178, 182 (Iowa 1991) (noting narrow exception to traditional rule in the case of jails or hospitals); *Nally v. Grace Community Church of the Valley,* 47 Cal.3d 278, 253 Cal.Rptr. 97, 763 P.2d 948, 956 (1988) (same); *McLaughlin v. Sullivan,* 123 N.H. 335, 461 A.2d 123, 125 (1983) (same). Plaintiff claims no reliance on the "custody or control" exception here, conceding the university's relationship with its students is not custodial in nature. What plaintiff *does* claim is that the university's knowledge of Sanjay's "mental condition or emotional state requiring medical care" created a special relationship giving rise to an affirmative duty of care toward him.

Plaintiff's focus is on the Restatement (Second) of Torts section 323. It states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323, at 135. He posits two possible circumstances that could establish the university's special duty to Sanjay under this record: (1) its adherence to an exception in federal legislation known as the "Buckley Amendment" that otherwise protects the confidentiality of student records, or (2) the university's adoption of a policy to notify parents of a

student's self-destructive behavior. Alternatively, Plaintiff asserts that Sanjay's "intervening" act of suicide constituted a significant part of the risk inherent in the university's negligent failure to notify, thereby rendering inapplicable the intervening-superseding cause doctrine relied upon by the district court.

The State counters that plaintiff has not preserved his argument concerning the Buckley Amendment. It then argues that the university's voluntary conduct created no actionable duty under section 323 of the Restatement and, because there existed no legally-recognized special relationship between Sanjay and the university, the superseding-intervening act doctrine absolves the university of liability as a matter of law. We shall consider the arguments in turn.

### A. Special relationship.

■ 1. *Duty arising under the Buckley Amendment.* Congress enacted the Family Educational Rights and Privacy Act (FERPA) to ensure access to educational records for students and parents while protecting the privacy of such records from the public. *See generally* 20 U.S.C. § 1232g (1990). The Act, commonly known as the "Buckley Amendment," strives to achieve its purpose by conditioning federal educational funding on compliance with its privacy requirements. *Student Press Law Ctr. v. Alexander*, 778 F.Supp. 1227, 1228 (D.D.C.1991). At issue here is an exception that permits institutions to disclose otherwise confidential information to "appropriate parties" when an "emergency" makes it necessary "to protect the health or safety of the student or other persons." 20 U.S.C. § 1232g(b)(1)(I). According to the terms of the implementing administrative regulations, the exception is discretionary in nature. *See* 34 C.F.R. § 99.36(a) (1994) (educational institution "may" disclose pertinent information "if" knowledge necessary to protect student). A companion regulation directs that the exception be "strictly construed." *Id.* at § 99.36(b).

■ Jain contends an emergency existed with respect to his son, Sanjay, and it was vitally important for Sanjay's parents to have information concerning the situation so they could intervene on his behalf. He then seems to argue that because the exception to the Buckley Amendment would have authorized revelation of the pertinent facts, the university was duty bound to reveal them. In other words, Jain claims the university misapplied the Buckley Amendment to his son's detriment, thereby giving rise to a cause of action "for any reasonably foreseeable injuries resulting therefrom."

We entertain serious doubts about the merits of plaintiff's argument. His claim rests, after all, not on a violation of the Act but on an alleged failure to take advantage of a discretionary exception to its requirements. We need not resolve the question, however, because plaintiff has not preserved the issue for our review. His claim that the university wrongfully withheld information "under the guise of the Buckley Amendment" was neither raised before the district court nor ruled upon in its decision. As a result we give the contention no further consideration. *See Benavides v. J.C. Penney Life Ins. Co.*, 539 N.W.2d 352, 356 (Iowa 1995) (issues must be "presented to and passed upon" by trial court to be raised and adjudicated on appeal).

2. *Restatement (Second) of Torts § 323.* That brings us to the crux of Plaintiff's claim—that the university has voluntarily adopted a policy (consistent with the Buckley Amendment) of notifying parents when a student engages in self-destructive behavior but it negligently failed to act on that policy in the case of Sanjay Jain. By not following its own policy, plaintiff argues, the "university deprived Sanjay of the medical intervention he so desperately needed."

The argument implicates section 323 of the Restatement (Second) of Torts. Al-

though this court has applied section 323 in a variety of settings, we have not before had occasion to consider the rule's application in the context of an allegedly preventable death by suicide. *See, e.g., American State Bank v. Enabnit,* 471 N.W.2d 829, 832 (Iowa 1991) (rejecting cause of action by bank against lawyer for alleged gratuitous undertaking with respect to escrow funds); *DeBurkarte v. Louvar,* 393 N.W.2d 131, 135 (Iowa 1986) (recognizing section 323 encompasses cause of action for "lost chance of survival"); *Van Iperen v. Van Bramer,* 392 N.W.2d 480, 485 (Iowa 1986) (traditional proof of causation in medical malpractice case not affected by section 323).

In *Power v. Boles,* the Ohio Court of Appeals neatly summarized what a plaintiff must prove to show assumption of a duty under section 323:

> Cases interpreting section 323(a) have made it clear that the increase in the risk of harm required is not simply that which occurs when a person fails to do something that he or she reasonably should have. Obviously, the risk of harm to the beneficiary of a service is always greater when the service is performed without due care. Rather, as the court stated in *Turbe v. Government of Virgin Islands, Virgin Islands Water & Power Auth.,* 938 F.2d 427, 432 (3d Cir.1991):
>
>> [Section] 323(a) applies only when the defendant's actions increased the risk of harm to plaintiff relative to the risk that would have existed had the defendant never provided the services initially. Put another way, the defendant's negligent performance must somehow put the plaintiff in a worse situation than if the defendant had never begun performance.... [T]o prevail under a theory of increased harm a plaintiff must "identify the sins of commission rather than sins of omission."

*Power,* 110 Ohio App.3d 29, 673 N.E.2d 617, 620 (1996) (citations omitted). Likewise with respect to the "reliance" prong of section 323(b), the *Power* court noted the general requirement that the plaintiff show "actual or affirmative reliance, i.e., reliance 'based on specific actions or representations which cause a person to forego other alternatives of protecting themselves.'" *Id.* at 621 (citations omitted); *accord* Restatement (Second) of Torts § 323 cmt. c, at 137.

■ Plaintiff argues, in essence, that once university employees discovered Sanjay and Roopa fighting over the moped keys, elicited comments suggestive of a suicide threat and referred Sanjay to counseling, they were bound under section 323 to follow through with their undertaking. In this case, plaintiff argues, that meant bringing the matter to the attention of the dean of students for the purpose of notifying Sanjay's parents.

Although, in hindsight, plaintiff's contention carries considerable appeal, the duty he seeks to impose upon the university cannot be squared with section 323(a) or (b). The record, read in the light most favorable to the plaintiff, reveals that Sanjay may have been at risk of harming himself. No affirmative action by the defendant's employees, however, increased that risk of self-harm. To the contrary, it is undisputed that the RAs appropriately intervened in an emotionally-charged situation, offered Sanjay support and encouragement, and referred him to counseling. Beth Merritt likewise counseled Sanjay to talk things over with his parents, seek professional help, and call her at any time, even when she was not at work. She sought Sanjay's permission to contact his parents but he refused. In short, no action by university personnel prevented Sanjay from taking advantage of the help and encouragement being offered, nor did they do anything to prevent him from seeking help on his own accord.

The record is similarly devoid of any proof that Sanjay relied, to his detriment, on the services gratuitously offered by these same personnel. To the contrary, it

appears by all accounts that he failed to follow up on recommended counseling or seek the guidance of his parents, as he assured the staff he would do. *See Power,* 673 N.E.2d at 622 (summary judgment proper in absence of proof that decedent abandoned other available opportunities to protect himself in reliance on defendant-city's gratuitous undertaking).

This case is distinctly different from the only case relied upon by plaintiff in support of his section 323 argument, *United States v. Gavagan,* 280 F.2d 319 (5th Cir. 1960). *Gavagan* involved the question of governmental liability for the unsuccessful rescue of a ship in distress at sea. *Gavagan,* 280 F.2d at 321. Although plaintiff understandably looks to the case as a metaphor for the failed rescue perceived in the case before us, the court's affirmance of a verdict for the estates of the deceased crew members in *Gavagan* turned on proof of the essential elements of Restatement section 323. The case reveals that but for negligent mistakes in the conveyance of vital information concerning the vessel's location, lives lost would have been saved. *Id.* at 328. Crucial to the court's decision was proof that the mistakes greatly increased the likelihood that the ship would not be found before dark, and reliance on the misleading information led others to abandon their search. *Id.*

By contrast to *Gavagan,* the record before us reveals that the university's limited intervention in this case neither increased the risk that Sanjay would commit suicide nor led him to abandon other avenues of relief from his distress. Thus no legal duty on the part of the university arose under Restatement section 323 as a matter of law. The district court was correct in so ruling.

### B. Superseding—intervening act doctrine.

■ In Iowa and elsewhere, it is the general rule that unless the possibility of accident or innocence can be reasonably determined, the act of suicide is considered a deliberate, intentional and intervening act that precludes another's responsibility for the harm. *Cutler,* 473 N.W.2d at 182; *McLaughlin,* 461 A.2d at 124; *Falkenstein v. City of Bismarck,* 268 N.W.2d 787, 790 (N.D.1978); W. Page Keeton, et al. *Prosser and Keeton on the Law of Torts* § 44, at 311 (5th ed.1984). As already noted earlier in this opinion, an exception to this general rule arises from the existence of a special relationship that imposes upon the defendant the duty to prevent foreseeable harm to the plaintiff. *Cutler,* 473 N.W.2d at 182. In such a case, the doctrine of intervening-superseding act will not relieve a defendant of liability. *Stevens by Stevens v. Des Moines Indep. Community Sch. Dist.,* 528 N.W.2d 117, 119 (Iowa 1995). That is because the intervening act (in this case, suicide) is the very risk the special duty is meant to prevent. *See id.* (noting it would be ironic to consider assault a superseding cause excusing a grade school for negligent breach of its supervisory duties when assault is the very risk the supervision is designed to prevent).

Here, the district court logically concluded that because no legally-recognized special relationship existed between the university and Sanjay, plaintiff could not rely on the exception to the intervening-superseding cause doctrine to counter the university's affirmative defense. We agree. Accordingly we affirm the district court's summary judgment for the State of Iowa.

**AFFIRMED.**

All justices concur except LAVORATO, J., who takes no part.