# United States Court of Appeals
## For the Eighth Circuit
_____

No. 24-3238
_____

Kent H. Payne, executor Estate of Jordan Kent Payne; Leslie Payne

*Plaintiffs - Appellants*

v.

Eyerly-Ball Community Mental Health Services; Scott Thomas

*Defendants - Appellees*

John Weakland; Jason Barnes; Madison County, Iowa

*Defendant*s
_____

Appeal from United States District Court
for the Southern District of Iowa - Central
_____

Submitted: September 18, 2025
Filed: January 6, 2026
_____

Before SMITH, GRUENDER, and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Jordan Payne, the son of Appellants Kent and Leslie Payne, tragically took his own life while incarcerated in the Madison County Jail in Winterset, Iowa. The day of his suicide, Jordan met with Appellee Scott Thomas, an employee of Appellee

Eyerly-Ball Community Mental Health Services (Eyerly-Ball). During this meeting, Jordan made several statements reflecting that he was experiencing an acute mental health crisis. But he also told Thomas that he was not "going to kill [himself] here," and just could not guarantee what he might do when he got out of custody. After concluding his interview with Jordan, Thomas told jail employee John Weakland that "Jordan had specifically told [him] on more than one occasion that he was not going to hurt himself in custody, but he was not sure what would happen when he left." Thomas did not, however, report Jordan's other statements to Weakland. After this conversation, Weakland had no concern that Jordan would harm himself. But approximately 10 minutes after Weakland returned him to his cell, Jordan hanged himself. The Paynes sued Thomas and Eyerly-Ball, alleging that their negligence contributed to Jordan's death. The district court granted Thomas and Eyerly-Ball summary judgment on the Paynes' negligence claims, reasoning that Thomas and Eyerly-Ball owed Jordan no legal duty. Having jurisdiction under 28 U.S.C. § 1291, we reverse the district court's grant of summary judgment.

I.

Jordan was booked into the Madison County Jail on June 9, 2020, on a warrant for contempt of court. During the booking process, Jordan indicated in response to screening questions that he had mental illnesses and a history of self-harm. Two days later, on June 11th, Jordan requested mental health services. Jail staff communicated this request to Thomas the same day. Thomas responded that he would come to the jail on the afternoon of June 12th.

At the time, Thomas worked for Eyerly-Ball as a Jail Diversion Case Manager. Eyerly-Ball is a community health center that provides mental health services in 20 Iowa counties. In 2020, it provided jail diversion and intensive case management services at the Madison County Jail under a contract. These services generally included screening inmates for mental health needs and connecting inmates to mental health service providers. Thomas describes his job responsibilities as a Jail Diversion Case Manager as including "screen[ing] individuals for possible

-2-

mental health concerns and discuss[ing] options for services and then refer[ring] [them] to services."

On the morning of June 12th, Leslie Payne called the Madison County Sheriff's Department to report that Jordan was "going nuts" and threatening to "chew the veins out of his arm." Leslie had learned this information from Jordan's girlfriend, who was communicating with him via the jail's Chirp messaging system. That afternoon, Weakland brought Jordan medications and asked if Jordan was "ok." Jordan responded that he needed to speak with a doctor, was "losing it in here," and that while he was generally "doing alright" his "head [was] just not right." Despite his answers to the jail's initial screening questions, his mother's call to the Sheriff's Department, and his statements to Weakland, Jordan was not placed on suicide watch or on any special monitoring plan.

Rather, Jordan simply met with Thomas as planned on the afternoon of the 12th. Thomas explained to Jordan that Eyerly-Ball is a "mental health agency" and that what it does is "meet with folks who are in jail here, [and] see if there's any mental health concerns that they might have." Thomas also mentioned that he had spoken with Weakland, who had informed him that Jordan was "concerned about [his] medications." Jordan—who struck Thomas as "agitated" and "animated"—shared the following with Thomas:

- I don't get this, and I lost everything. I lost my girlfriend. I lost - - I lost my house [inaudible], my Jeep. I'm going to be homeless when I get out [of] here. So I'm not doing so well at all.

- I'm losing - - losing everything up there, and I'm sitting here and I [inaudible] g[a]ve myself a black eye because I'm hearing these fucking things in my head telling me all sorts of stupid shit, and I'm not trying to listen to it, and I went back on Seroquel, so [inaudible] hearing voices good.

- I'm not in good shape right now.

-3-

- I got a girlfriend just now who thinks I'm cheating on her. It's not - - And then, you know, everything was - - everything was great. You know, I went to prison, and I rebuilt my life back up, and then now I'm not doing so well. I'm not doing great. I was doing great up until Monday. I mean, I had a great job. I was - - the Vraylar and BuSpar worked just fine, but here I am, I got no TV and I'm stuck in a room for weeks [inaudible] nothing. I mean I got [inaudible] roommate. I got no TV. I got a phone [that] doesn't work.

- Well, hey, I've got a broken [inaudible] ankle, I've got a broken tailbone too.

- I can't do nothing. . . . I'm not normally this way. I don't know what the hell's wrong with me, Scott. I'm not this way at all.

- I got one of those - - those Chirp things, one of those so you can text back and forth - - - - to the outside and all that stuff. Yeah, right now my girlfriend thinks I cheated on her four weeks ago, so now I know that's gone; but, like, I'm getting these thoughts in my head and shit like that, and the only person I got to talk to was her and all that shit, and I'm afraid that she might just call up here and say, you know, put him on suicide watch and all that shit. . . . But I got these thoughts in my head that are like: Chew my veins out. I mean, shit like that. Like, I don't want these thoughts in my head.

- I went to prison for slitting my wrists . . . .

After sharing this information with Thomas, Jordan asked if their conversation would remain confidential. Thomas assured him it would, unless Thomas received a subpoena. Jordan then divulged the following:

- So I've had like seven suicide attempts in the past year. I lost my kids. I lost everything. I'm not going to kill myself here, but I [am not] going to guarantee I w[on't] kill myself when I leave here.

-4-

- I got nothing left anymore, and I don't know - - I mean, I can't sleep. I can't - - There's nothing I can do. I'm sitting here, and just I'm thinking, and I'm hearing shit, and this won't go away, hence the black eye.

- I'm not like this normally, but I [don't want to] go on suicide watch, and I'm [inaudible] to kill myself here. I don't want to. I'm not going to [inaudible] that.

- I don't want to kill myself in general. I'm sorry. Sorry. Count to ten.

- After I slit my wrists, they brought me here instead of taking me to the hospital.

- And they chained me to the bed with bloody wrists. . . . I'm pretty much in solitary confinement, and I did nothing wrong. I just got here on M-, M-, - - Tuesday. Yeah, I haven't ate anything. I won't eat anything. I'm afraid [inaudible] the food. I haven't ate one meal since I've been here.

- I can calm myself down; I just can't keep it calm. Does that make sense?

- Then [inaudible] started fucking slapping myself or start hitting myself. I didn't do this before. What the fudge is happening to me? I'm going insane.

- I've never done it before, but I just want it to stop. Have you ever had a thought to, like, chew your own veins out of your frickin' hand - - or arm? . . . Yeah. And neither have I. Neither have I. Until now. What the shit? It's just insane [inaudible] crazy in there.

Thomas told Jordan that he would schedule Jordan for "the first available appointment I can get to see the psychiatrist." Shortly after the meeting concluded, Thomas told Weakland that Payne had said that "he was not going to hurt himself in

custody, but he was not sure what would happen when he left." Thomas later explained that he told Weakland this because he "felt that [it] was important for [Weakland] to know [this information] for caring for [Payne], [and] supervising him." But Thomas did not relay Jordan's statements about his prior suicide attempts, his history of mental illness, current injuries that were causing him pain, hearing voices, difficulty sleeping, his sense of hopelessness and impression that he would have nothing when he got out of custody, or relationship difficulties. And Thomas does not remember if he told Weakland that Payne had commented on thinking about chewing out his veins. When later deposed in this matter, Weakland testified that he did "not recall the specifics of [his] conversation" with Thomas but knew "at the time there was no concern that Jordan was going to hurt himself" and that "after we spoke [] there was not any concern."

Madison County Sheriff Jason Barnes, who held overall supervisory authority over the jail, testified that jail staff relied on Thomas and Eyerly-Ball to respond to inmate mental health crises and communicate those inmates' needs to them. Sheriff Barnes explained that "[i]f we have an inmate in our jail that's having a mental crisis or issue or needs assistance of some type mentally, we will then contact Eyerly Ball. They will then send Scott Thomas down, or whoever they have working, to do his thing." Sheriff Barnes also testified that it was his "understanding [that] [Eyerly-Ball] w[as] going to help us help inmates who were having mental health crises" and would "keep us informed." In Sheriff Barnes's view, it was Thomas's role to "come in and meet with the inmate, and then . . . make a determination what the best move is from th[at] point on." Sheriff Barnes also agreed that he believed Thomas "would be in a position to evaluate or at least make a preliminary assessment of the inmates' mental health conditions" and "suicide risk." And he expected that "there would be open communication . . . on what's going on, [and] what [jail staff] need[ed] to do next" and that Thomas, if he identified concerning behaviors indicating risk to an inmate, would communicate those to jail staff.

Consistent with Sheriff Barnes' expectations, Thomas testified that relaying inmate suicide risks to jail staff would be in line with his job duties. Per Thomas, if

-6-

an inmate "check[ed] all the boxes" for suicide risk, he would communicate to jail staff that the inmate was "checking all the boxes. This is what's going on. This person is saying this, this, and this." Thomas agreed that it would be "important" for him "to communicate th[is] information to Madison County" in order for him to "fulfill [his] job obligations with Eyerly Ball" and that it would be "imperative" and "consistent with what [he was] hired and paid to do to forward th[is] information on to the jail." He further agreed that it was generally important for him to communicate effectively with the jail and that effective communication was part of his job.

After speaking with Thomas, Weakland escorted Jordan back to his cell. About 10 minutes later, Jordan hanged himself. Roughly 90 minutes after that, Weakland discovered Jordan's body while checking on his cell.

The Paynes filed a six-count complaint in the district court, alleging 42 U.S.C. § 1983 and supplemental state-law claims against Weakland, Barnes, Madison County, Eyerly-Ball, and Thomas. The district court dismissed the Paynes' federal-law claims on a motion for partial summary judgment. But it retained jurisdiction over their state-law claims in view of "the substantial amount of time and judicial resources expended in this case." The Paynes then dismissed with prejudice their remaining claims against Weakland, Barnes, and Madison County. At that point, the only claims remaining in the suit were Iowa-law negligence claims against Thomas and Eyerly-Ball and a wrongful death claim against Thomas.

Thomas and Eyerly-Ball filed a second motion for summary judgment, contending that they were entitled to judgment as a matter of law because they owed Jordan no legal duty. The district court agreed. Relying on §§ 40 and 42 of the Restatement (Third) of Torts, the district court reasoned that neither defendant owed Jordan a duty based on a special custodial relationship or based on a voluntary undertaking. The district court further reasoned that, to the extent that the Paynes were attempting to assert negligent training and negligent supervision claims against

-7-

Eyerly-Ball, the Paynes had failed to raise genuine disputes of material fact on other elements.

The Paynes appeal. They contest only the district court's no-duty determination.

II.

"We review a district court's grant of summary judgment de novo, including its interpretation of state law." Metro. Prop. & Cas. Ins. Co. v. Calvin, 802 F.3d 933, 937 (8th Cir. 2015) (citation omitted). "Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-movant, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." Id. (citation omitted).

Under Iowa law, "[a]n actionable claim of negligence requires '[1] the existence of a duty to conform to a standard of conduct to protect others, [2] a failure to conform to that standard, [3] proximate cause, and [4] damages.'" Thompson v. Kaczinski, 774 N.W.2d 829, 834 (Iowa 2009) (citation omitted). "Duty is a question of law for the court to decide." Morris v. Legends Fieldhouse Bar & Grill, LLC, 958 N.W.2d 817, 822 (Iowa 2021). But "if the facts underlying a plaintiff's claim of duty are *disputed*, summary judgment is improper." McGraw v. Wachovia Sec., L.L.C., 756 F. Supp. 2d 1053, 1077 (N.D. Iowa 2010) (applying Iowa law); see also Sankey v. Richenberger, 456 N.W.2d 206, 207 (Iowa 1990) (concluding that "resolution by way of summary judgment is proper" when "the facts underlying the plaintiffs' claim of duty are not disputed").

It is blackletter law that "[a]n actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm." Restatement (Third) of Torts: Phys. & Emot. Harm § 7(a) (A.L.I. 2010); see also Morris, 958 N.W.2d at 825 (invoking § 7 in a duty analysis). Conversely, if an actor's conduct *does not* create a risk of physical harm, that actor ordinarily owes no duty unless some

-8-

affirmative duty recognized in law applies. <u>See</u> Restatement (Third) of Torts: Phys. & Emot. Harm § 37 (A.L.I. 2012) ("An actor whose conduct has not created a risk of physical . . . harm to another has no duty of care to the other unless a court determines that one of the affirmative duties provided in §§ 38-44 is applicable."); <u>Morris</u>, 958 N.W.2d at 825 (recognizing the general rule that there is no duty of care when an actor's conduct does not create a risk of harm).

On appeal, the Paynes do not argue that the ordinary duty of care recognized in § 7 applies—i.e., they do not contend that Thomas and Eyerly-Ball created the risk that Jordan would commit suicide. Instead, they assert that Thomas and Eyerly-Ball owed Jordan affirmative duties. They argue that two such duties are implicated here.

A.

The Paynes first point to the duty to third parties based on undertakings to others recognized in Restatement (Second) of Torts § 324A (A.L.I. 1965) and its successor section in the current Restatement, Restatement (Third) of Torts: Physical & Emotional Harm § 43 (A.L.I. 2012). Thomas and Eyerly-Ball counter that the Paynes waived their arguments under §§ 324A and 43 because they relied on two different Restatement provisions—§ 323 of the Second Restatement and its successor provision, § 42 of the Third Restatement—in the proceedings before the district court.

But these Restatement provisions all substantially overlap. All contemplate a duty of care under the same general circumstances: when the defendant embarks on an undertaking calculated to *reduce* the risk of physical harm to another but instead *increases* that risk (possibly because some other party is relying on the defendant to exercise reasonable care). <u>Compare</u> Restatement (Second) of Torts § 324A (A.L.I. 1965), <u>and</u> Restatement (Third) of Torts: Phys. & Emot. Harm § 43 (A.L.I. 2012), <u>with</u> Restatement (Second) of Torts § 323 (A.L.I. 1965) <u>and</u> Restatement (Third) of

-9-

Torts: Phys. & Emot. Harm § 42 (A.L.I. 2012). To the extent they do overlap,[1] there is no waiver. And—as Thomas and Eyerly-Ball concede—the duty analysis is the same "regardless of which Restatement provision is analyzed."

Because the district court applied § 42 of the Third Restatement in its duty analysis, we will too.[2] Section 42 provides that:

> An actor who undertakes to render services to another and who knows or should know that the services will reduce the risk of physical harm to the other has a duty of reasonable care to the other in conducting the undertaking if:
>
> (a) the failure to exercise such care increases the risk of harm beyond that which existed without the undertaking, or

[1]Sections 323 and 42 differ from §§ 324A and 43 in one way that is potentially relevant here: they always require increased risk or reliance, where §§ 324A and 43 can be satisfied by the mere showing that the defendant has undertaken a duty owed by another to the plaintiff. See Restatement (Second) of Torts § 324A(b) (A.L.I. 1965); id. cmt. d ("Even where the negligence of the actor does not create any new risk or increase an existing one, he is still subject to liability if, by his undertaking with the other, he has undertaken a duty which the other owes to the third person."); Restatement (Third) of Torts: Phys. & Emot. Harm § 43(b) (A.L.I. 2012); id. cmt. g ("When an actor undertakes to perform a duty that another person owes to a third person, the actor is subject to a duty of reasonable care. This duty does not require increased risk or reliance."). Because the Paynes did not squarely argue before the district court that Thomas and Eyerly-Ball undertook the Madison County Jail's duty to Jordan within the meaning of §§ 324A(b) and 43(b), we consider that particular theory of duty waived. And when that particular theory is not on the table, the duty analysis is the same regardless of which Restatement provision we apply.

[2]The Iowa Supreme Court has applied § 42's predecessor section—Restatement (Second) of Torts § 323 (A.L.I. 1965)—in conducting duty analyses. See Jain v. State, 617 N.W.2d 293, 299 (Iowa 2000) (collecting cases). But § 42 of the current Restatement and § 323 of the Second Restatement do not differ in any way that is meaningful here. Compare Restatement (Third) of Torts: Phys. & Emot. Harm § 42 (A.L.I. 2012), with Restatement (Second) of Torts § 323 (A.L.I. 1965).

(b) the person to whom the services are rendered or another relies on the actor's exercising reasonable care in the undertaking.

Restatement (Third) of Torts: Phys. & Emot. Harm § 42 (A.L.I. 2012).

The district court reasoned that Thomas and Eyerly-Ball's actions in this case did not trigger a duty under § 42 because the services they rendered did not subject Jordan to any *greater* risk than he would have faced had they provided no services at all:

> In this case, Thomas's services consisted of an interview with Jordan. After the interview, Thomas arranged for a telehealth appointment for Jordan later that afternoon. As Defendants point out, Jordan was not on suicide watch prior to the interview, nor was he under any other heightened supervision. At the end of the interview, Jordan returned to his cell under the same level of supervision as before Thomas undertook his services. Plaintiffs do not identify any action that Thomas took that resulted in Jordan being in a worse situation than prior to his interview. Accordingly, there was no legal duty imposed under Section 42 of the Restatement.

The problem with this analysis is that it views the scope of Thomas and Eyerly-Ball's activity exclusively from their perspective, consequently frames the scope of their undertaking quite narrowly, and then concludes that this narrow undertaking did not trigger a duty. But in ruling on a motion for summary judgment, a district court must "view[] the facts in the light most favorable to the nonmoving party and giv[e] that party the benefit of all reasonable inferences that can be drawn from the record." Holt v. Howard, 806 F.3d 1129, 1132 (8th Cir. 2015) (citation omitted).

Here, the Paynes adduced evidence reflecting that Thomas and Eyerly-Ball's undertaking was not so limited—arguably, their undertaking included assessing and communicating suicide risks. Evidence of what Thomas and Eyerly-Ball *actually did* informs the scope of their undertaking. Construed in the light most favorable to

-11-

the Paynes, the record supports an inference that Thomas did not *only* interview Jordan and schedule him for an appointment. Instead, the fact that Thomas passed Jordan's statement that he did not intend to kill himself in custody on to Weakland supports an inference that Thomas *did* assess Jordan's risk of self-harm and communicate his impression of that risk.

Moreover, the Paynes adduced testimony that jail staff viewed Thomas and Eyerly-Ball's work to include assessing and communicating suicide risks. Indeed, when deposed, Sheriff Barnes explained that he expected that Thomas would "open[ly] communicat[e] . . . on what's going on, [and] what [jail staff] need[ed] to do next" after Thomas met with inmates, and agreed that, if Thomas identified "concerning behaviors or concerning statements," the expectation was that Thomas would communicate those to jail staff. Jail staffs' view of the scope of Thomas and Eyerly-Ball's role is relevant to the scope of their undertaking. See Restatement (Third) of Torts: Phys. & Emot. Harm § 42 cmt. g (A.L.I. 2012) ("Acts that comprise an undertaking are often ambiguous with respect to the scope of the undertaking. When reliance is the basis for the increased risk, fairness suggests that the scope of the undertaking be interpreted from the perspective of those who might reasonably have relied on the undertaking."). And Thomas himself testified that, if an inmate "check[ed] all the boxes" for suicide risk, it would be consistent with what he was paid to do to communicate that information to jail staff. A reasonable jury might infer from that testimony that Thomas and Eyerly-Ball did, in fact, undertake to assess and communicate inmate suicide risks.

When the appropriate inferences on the scope of Thomas and Eyerly-Ball's undertaking are drawn, we find that fact issues exist as to increased risk and reliance (and thus, predicate fact issues preclude a no-duty determination). Under the current version of the Restatement, "[t]he requirement that the actor increase the risk of harm means that the risk to the other person is increased beyond that which existed in the absence of the actor's undertaking." See Restatement (Third) of Torts: Phys. & Emot. Harm § 42 cmt. f (A.L.I. 2012). The Restatement's commentary further

explains that "reliance is merely a specific manner of increasing the risk of harm to another." Id.

When the evidence is viewed in the light most favorable to the Paynes, a reasonable jury could conclude that Thomas and Eyerly-Ball placed Jordan in a worse position by undertaking to assess and communicate the risk that he would commit suicide and then by failing to adequately do so. Although Jordan was not on suicide watch (or any other sort of formal monitoring plan), a jury might infer that Weakland had some background level of concern about Jordan's safety. During the intake process, Jordan responded affirmatively to questions indicating a heightened suicide risk. Jordan also requested mental health treatment shortly after arriving at the jail. Further, Jordan's mother called the Sheriff's Department to report that Jordan was "going nuts" and threatening to "chew the veins out of his arm." And Jordan explicitly told Weakland that he was "losing it" and needed to see a doctor.

A jury could also reasonably infer that Thomas, by selectively reporting Jordan's interview statements, gave Weakland the false impression that Jordan was not at risk—essentially eliminating any concerns that Weakland may have had and causing Weakland to let his guard down. Indeed, Weakland recalled of his conversation with Thomas that "there was no concern that Jordan was going to hurt himself." The increased risk here can be described as the difference between an alert and reassured jailer. Or, stated differently, a jury might reasonably infer that Weakland elected to forgo more frequent monitoring or other suicide-prevention measures he might otherwise have engaged in in reliance on Thomas's off-base assessment.

Because there are predicate factual issues going to the scope of Thomas and Eyerly-Ball's undertaking and to the issues of increased risk and reliance, we hold that summary judgment was not appropriately granted on the issue of duty. These predicate questions are for the jury to resolve in the first instance. See, e.g., Sankey, 456 N.W.2d at 207 (recognizing that a no-duty grant of summary judgment is proper

only where the facts underlying the claim of duty are undisputed); see also Restatement (Third) of Torts: Phys. & Emot. Harm § 42 cmt. d (A.L.I. 2012) ("When underlying facts are in dispute, the question of whether a duty exists must be submitted to the factfinder with appropriate alternative instructions."); id. § 42 cmt. g ("The scope of an undertaking can be determined only from the facts and circumstances of the case. When reasonable minds can differ about whether the risk or negligence was within the scope of the undertaking, it is a question of fact for the factfinder.").

In an attempt to avoid this result, Thomas and Eyerly-Ball rely heavily on the Iowa Supreme Court's decision in Jain v. State, 617 N.W.2d 293 (Iowa 2000). But in our view, the differences between this case and Jain underscore why summary judgment was not appropriately granted here. Jain involved a wrongful death suit brought against the University of Iowa after university student Sanjay Jain committed suicide in his dorm room. Id. at 294. Two weeks before Jain's suicide, resident assistants at his dorm responded to a reported domestic dispute. Id. at 295. They spoke with Jain's girlfriend, who stated that Jain was preparing to commit suicide by inhaling exhaust fumes from his moped. Id. The next day, Beth Meritt, the dorm's hall coordinator, met with Jain, encouraged him to seek counseling, and demanded that he remove the moped from his room. Id. She also gave Jain her phone number and urged him to call her if he thought he might hurt himself. Id. And she discussed the incident with her supervisor, the university's assistant director for residence life. Id. But nobody from the university advised Jain's parents that he had attempted to harm himself, and Jain ultimately took his own life by inhaling moped fumes. Id. at 296. Jain's father sued, contending that the university owed Jain a duty under § 42's predecessor section, Restatement (Second) of Torts § 323 (A.L.I. 1965), because it failed to follow through on an undertaking it had begun when its staff had responded to Jain's earlier suicide attempt and referred him to counseling. Id. at 288-99. The Iowa Supreme Court rejected this theory:

> Although, in hindsight, plaintiff's contention carries considerable appeal, the duty he seeks to impose upon the university cannot be

-14-

squared with section 323(a) or (b). The record, read in the light most favorable to the plaintiff, reveals that Sanjay may have been at risk of harming himself. No affirmative action by the defendant's employees, however, increased that risk of self-harm. To the contrary, it is undisputed that the RAs appropriately intervened in an emotionally-charged situation, offered Sanjay support and encouragement, and referred him to counseling. Beth Merritt likewise counseled Sanjay to talk things over with his parents, seek professional help, and call her at any time, even when she was not at work. She sought Sanjay's permission to contact his parents but he refused. In short, no action by university personnel prevented Sanjay from taking advantage of the help and encouragement being offered, nor did they do anything to prevent him from seeking help on his own accord.

The record is similarly devoid of any proof that Sanjay relied, to his detriment, on the services gratuitously offered by these same personnel. To the contrary, it appears by all accounts that he failed to follow up on recommended counseling or seek the guidance of his parents, as he assured the staff he would do.

Id. at 299-300.

Here, unlike in Jain, there is evidence that would allow a jury to infer that the relevant undertaking put the deceased in a worse position than he would have been in without the undertaking. Had Thomas never met with Jordan and communicated to Weakland what may be characterized as an assessment that Jordan would not harm himself in custody, Weakland, having some background indications that Jordan was in distress, may have checked up on Jordan more regularly or taken other suicide-prevention measures. Jain involves no such facts. And Jain does not mandate a no-duty determination in this case.

Thomas and Eyerly-Ball also argue that Iowa courts recognize a freewheeling "control rule" that would preclude a finding of duty here. Their theory is essentially that, because they did not have the formal authority to compel the Madison County Jail to do or refrain from doing anything in its supervision of Jordan, they cannot be held liable for his death. But the cases Thomas and Eyerly-Ball cite in support of

-15-

this theory do not address the duty-based-on-undertaking context. They do not support the proposition that, where a defendant embarks on an undertaking to provide services for the purpose of reducing a risk of physical harm, but increases that risk of harm by failing to exercise reasonable care or through another's reliance on the defendant's exercising reasonable care, that defendant is somehow immune from liability. See Lukken v. Fleischer, 962 N.W.2d 71, 77 (Iowa 2021) (concluding that the defendant had no duty of care with respect to a zip-line braking system it had neither designed nor constructed); McCormick v. Nikkel & Assocs., Inc., 819 N.W.2d 368, 374 (Iowa 2012) (framing cases "involving parties that turn over control of premises to another party" as a distinct category of cases where a no-duty rule applies); Morris, 958 N.W.2d at 826 (Iowa 2021) (holding that a strip club owed no duty to an ejected patron who refused the club's offer of a cab ride, chose to depart the club's parking lot on foot, and was killed by a drunk driver half a mile away from the club). Thompson and Eyerly-Ball's cases do not persuade us that, under Iowa law, negligence defendants do not remain responsible for risks within the scope of their activities. See McCormick, 819 N.W.2d at 374 (recognizing that a contractor performing work on premises may still be held liable for defects in that work).

B.

The Paynes also assert that Thomas and Eyerly-Ball stood in a special relationship with Jordan because they provided mental-health services in a custodial setting and thus owed Jordan a duty in line with the principles of Restatement (Third) of Torts: Phys. & Emot. Harm § 40 (A.L.I. 2012).[3] While we find that the Paynes raised factual issues that preclude summary judgment on their undertaking-based theory of duty, the Paynes' second theory bears addressing because the types of duties potentially in play will inform how the district court must instruct the jury. See Restatement (Third) of Torts: Phys. & Emot. Harm § 40 cmt. e (A.L.I. 2012) (recognizing that "[i]f disputed historical facts bear on whether" a special

---

[3]The Iowa Supreme Court follows § 40 of the Third Restatement in duty analyses. See, e.g., Morris, 958 N.W.2d at 822, 825-26.

-16-

relationship of the type recognized in § 40 exists then "the jury should resolve the factual dispute with appropriate alternative instructions"). The Paynes' § 40 theory is not viable. Per § 40:

> (a) An actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of the relationship.
>
> (b) Special relationships giving rise to the duty provided in Subsection (a) include:
>
> ***
>
> > (7) a custodian with those in its custody, if:
> >
> > > (a) the custodian is required by law to take custody or voluntarily takes custody of the other; and
> > >
> > > (b) the custodian has a superior ability to protect the other.

Id. §40.

The district court rejected the Paynes' theory, reasoning that "[t]he 'custodial' relationship identified by the Restatement may apply to Madison County, but should not be imputed to Eyerly Ball and Thomas who at no point had custody of Jordan." We agree with the district court's reasoning. The Paynes do not dispute that Thomas and Eyerly-Ball did not have custody over Jordan, and that it was instead Madison County that did. Thus, the Paynes' theory is an imprecise fit for the duty § 40 recognizes for custodians. But "[c]ourts have not been sympathetic to efforts to extend the duty imposed on custodians to others who have a relationship with, say, a patient, but a noncustodial one." Restatement (Third) of Torts: Phys. & Emot. Harm § 40 reporters' note cmt. n (A.L.I. 2012). The Paynes cite no case suggesting that an Iowa court would recognize a duty based on a custodial or similar relationship here. And we decline to predict that Iowa courts would do so. Cf. Karas v. Am. Family Ins. Co., 33 F.3d 995, 1000 (8th Cir. 1994) (recognizing that the role of

federal courts adjudicating state-law claims "is to interpret state law . . . and not to fashion it").

## III.

Based on the foregoing, we conclude that there are genuine disputes of material fact that precluded the district court's finding that Thomas and Eyerly-Ball owed Jordan no undertaking-based duty. We agree with the district court, however, that if Thomas and Eyerly-Ball owed Jordan a duty, it was not a duty based on a custodial relationship as recognized in § 40 of the Third Restatement. We reverse the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.

_____